ROLAND M. SMYTHE v. CENTRAL VERMONT RAILWAY COMPANY.

October Term, 1912.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed May 20, 1914.

*Obligations of Receivers—Receivers Notes or Bonds—Negotiability—Recognition—Transfer to Bona Fide Purchaser—Equity—Pleading—More Specific Answer—Demurrer—Reservation—Master's Report—Exceptions—Sufficiency—Evidence—Books of Account—Memoranda—Books of Receivers—Presumption as to—Status of.*

Obligations issued by receivers, without personal liability, but constituting a lien on the property, are not negotiable instruments, chiefly because there is no certainty as to the payor, but where they are authorized by the court, which undertook to issue them as negotiable paper, they should be accorded the usual attributes of such obligations.

Corporate promissory notes and ordinary corporate bonds are negotiable instruments.

Where receivers' notes or bonds, part of an issue authorized by the court, were pledged to secure a loan to the receivers, the pledgee's special property in the notes or bonds ceased on payment of the loan, and any subsequent negotiation of the securities by the pledgee would be invalid, except in the hands of a *bona fide* purchaser for value and without notice.

Title to negotiable paper is defective if it is negotiated unlawfully or in circumstances that amount to a breach of faith.

Where the Supreme Court in fixing the amount of the indebtedness of a railroad company, determined that the amount of income and extension bonds outstanding was made up of the two sums, $680,900 issued in exchange for other bonds, and $1,008,600 otherwise negotiated, taking no notice of certain bonds that had been pledged by the receivers as collateral security, it thereby in effect determined that the bonds so pledged either had been returned or were unlawfully held.

The way for an orator to get a more specific answer is by excepting thereto.

Where a suit in chancery went to hearing before a master on an insufficient answer and on a cross bill to which orator might have demurred, but which he answered, and the master has made his report, the orator is not entitled, on appeal from the decree on that report, to have the case disposed of on bill and answer.

Where, in the litigation in the course of which certain income and extension bonds were duly issued by the receivers of a railroad company, the Supreme Court at one time determined that only $1,689,500 of a total issue of $2,500,000 was lawfully outstanding, one who, at a large discount, thereafter purchased bonds of that issue which were not included in that $1,689,500, was put on inquiry by that litigation, and was chargeable with all knowledge that any of its proceedings revealed.

In a suit in chancery to enforce the collection of certain bonds duly issued by receivers of a railroad company, and by them pledged as collateral security, but which were unlawfully transferred by the pledgee after payment of the debt for which they were pledged, evidence *held* to sustain the finding that orator was not a *bona fide* purchaser for value.

In a suit in chancery to enforce the collection of certain bonds issued by receivers of a railroad company in 1872, testimony of a witness that he was continuously associated with the property from 1871 to 1877 with his father, one of the receivers, that after 1877 he was associated with the property as attorney, director, vice-president, and president, successively, of a predecessor of defendant company, and as one of its receivers, having custody of its books of original entries by the proper persons, whose handwriting he identified, and who were dead, as were all the receivers who signed the bonds in question, was not objectionable as hearsay, and the books were properly received in evidence in connection with the witness's testimony.

In a suit to enforce the collection of bonds issued by receivers of a railroad, who are all dead, their duly authenticated books are not the books of a party, but rather the books of the court, accessible to everybody interested in their contents, are admissible generally, and are not within the rule that a party's books are not evidence in his favor except as to what they affirmatively show.

As receivers of a railroad company were charged with the duty of keeping books showing their transactions, it will be presumed that they did that duty and made such entries as they were required to make and so the absence of any entry in such books

concerning an alleged transaction is some evidence that it did not occur.

Exceptions to a master's refusal to comply with·four designated requests "so far as they were not complied with," and an exception for. errors, not in anyway indicated, manifest on the face of the record, are too vague to reserve any question.

Exceptions not briefed by the exceptor are waived, although his brief recites that they are not waived.

Where before hearing on the merits of a bill in chancery defendant's demurrer was overruled and the benefit of the demurrer reserved to him until final hearing, that did not formally reinstate the demurrer, but only reserved to defendant the right thereafter to raise and insist on all questions made under the demurrer, and so it was technical error to consider the demurrer again separately, and again to overrule it, as a part of the decree on the merits.

APPEAL IN CHANCERY.   Heard on the pleadings, including a cross bill, and the report of a special master, in vacation after the September Term, 1911, Franklin County, *Waterman,* Chancellor.   Decree for the orator, strictly *pro forma,* filed March 9, 1912.   The defendant appealed.   The opinion states the case.

*Hollis R. Bailey* and *H. Charles Royce* for the orator.

*W. B. C. Stickney* for the defendant.

HASELTON, J.   This is a suit in chancery brought by the holder of certain bonds or notes and attached coupons to secure payment thereof through the. enforcement of a claimed lien on property held and controlled by the defendant company.   The cause was first heard on demurrer to the bill.   The demurrer was overruled and the benefit thereof was reserved to the defendant, and the defendant was given leave to make answer.   Thereafter the defendant filed its answer and a cross complaint.   In due course the complainant joined issue with the defendant on its answer and filed. an answer to the cross complaint.   The cause was referred to and heard by a special master, and after the filing of his report the complainant filed exceptions thereto.   In 1912 the case was brought on for. hearing before a chancellor, and a decree in favor of the orator was rendered strictly *pro forma* and without prejudice to either party by reason of the *pro forma* character of the decree.   The defendant appealed to this Court.

The bonds in question are five in number, each of the face value of $1,000, not including interest coupons, and are num-

bered 163, 166, 167, 178, and 179 of an issue of ''Income and Extension Bonds'' so called, dated May 1, 1872, and payable thirty years after date, that is, May 1, 1902. It was shortly after the latter date that this suit was brought.

The *pro forma* decree in favor of the complainant was for $33,429.73, as of the date of the decree, to secure the payment of which sum a valid and subsisting lien was declared to exist upon property of which the defendant is the present holder and owner, and as a part of the decree an order of foreclosure against such property was made unless the sum above mentioned should be paid to the complainant within sixty days after the date of the decree.

With respect to the signers of the bonds, the circumstances under which the issue was made, and the rights and obligations thereby arising the following facts appear.

In 1855, the Vermont and Canada Railroad Company brought a bill of complaint against the Vermont Central Railroad Company in the court of chancery for Franklin County, and thereafter such proceedings were had in the cause that both companies were placed in the hands of receivers who later were also designated as trustees and managers. During the receivership it was necessary that the receivers, trustees and managers should from time to time borrow money on the security of the property in their possession; and this they did by virtue of authority conferred by various decrees of the court of chancery.

In the spring of 1872, the trustees and managers, being in need of money to meet debts and liabilities already incurred and to meet current obligations, were authorized by a decree of the court of chancery to issue and dispose of their notes to an amount not exceeding $2,500,000. The time of payment was to be not more than thirty years from date and the interest was to be paid semi-annually. The trustees and managers were to be without personal liability in respect to the issue, and it was ordered and decreed that the notes issued in accordance with the decree should constitute a lien and charge upon the trust property and earnings thereof under the control of the trustees and managers; and it was further provided that in case the trustees and managers should fail to pay the notes or the interest as it should become due, the holders of the notes, or any of them, might apply to the court of chancery for a realization of his or their securities or for a summary order for the payment of the amount due out of the property or current earn-

ings of the railroads under the control of the trustees and managers. .

Pursuant to the authority conferred by the decree, the trustees and managers executed and issued notes for the full amount authorized. Each note recited that for value received the trustees and managers of the Vermont Central and Vermont and Canada Railroads, as trustees and managers only, and out of the funds and property and securities devoted to that purpose by virtue of the decree would pay to ————— or bearer a sum named thirty years after date with interest payable semiannually at the office of the trustees and managers in Boston, Massachusetts.

The decree authorizing the issue was indorsed on the back of each note.

The interest was expressed in coupons attached to the bonds. This issue of notes, as they are called in the decree, and as they are, at least in form, were known as "Income and Extension Bonds," and are spoken of indifferently as notes, or bonds, by the master. They are not under seal but in accordance with common usage they will hereafter in this opinion be called bonds.

Obligations issued by receivers without personal liability but constituting a lien on property are not strictly negotiable instruments chiefly because there is no certainty as to the payor. *Union Trust Co.* v. *Chicago &c. R. Co.,* 7 Fed. 513, and cases cited; *Union Trust Co.* v. *Illinois &c. Co.,* 117 U. S. 434, 456, 29 L. ed. 963, 6 Sup. Ct. 809; *Turner* v. *Peoria ,&c. R. Co.,* 95 Ill. 134, 35 Am. Rep. 144.

But they are evidences of indebtedness authorized by the court, and as here the court of chancery undertook to authorize the issue of these receivers' notes as negotiable paper, it seems that they should be accorded the usual attributes of negotiable paper.

In fact this Court has said of this very issue of securities and of other like issues, "the bonds were negotiable in form and have been sold and transferred like other negotiable paper," and this Court has accorded to these obligations the character of negotiable instruments, though pointing out that they were in fact "just what they purported to be—obligations of receivers and managers." *Langdon* v. *Railroad Co.,* 53 Vt. 228, 272.

The obvious intent was to. give these receivers' notes the negotiability of corporate notes and bonds so far as that could be done without conflicting with the doctrine of *lis pendens;* and the character of corporate notes and bonds as negotiable instruments whether or not they are under seal is well settled. *Ide* v. *Conn. & Pass. Rivers Railroad Co.,* 32 Vt. 297; *Morris Canal &c. Co.* v. *Fisher,* 9 N. J. Eq. 667, 64 Am. Dec. 432, and note; *National &c. Bank* v. *Hartford &c. R. Co.,* 8 R. I. 375, 91 Am. Rep. 582; *Mercier County* v. *Hackett,* 1 Wall. 83, 17 L. ed. 548; *White* v. *Vermont &c. R. Co.,* 21 How. 575, 579, 16 L. ed. 221; *Marion County* v. *Clark,* 94 U. S. 278, 24 L. ed. 59.

In the spring of 1873, the receivers, trustees and managers of the Vermont Central Railroad Company, who had issued the bonds in question, went out of office and were succeeded as receiver, trustee and manager by the Central Vermont Railroad Company incorporated in 1872. A majority of the former receivers who had personally managed the railroads were directors and officials of the Central Vermont Railroad Company, and as such directors and officials continued to give the same attention as formerly to the management and control of the property. Meanwhile, that is in the fall of 1872, the floating debt of the receivers, trustees and managers, amounting to nearly $2,800,000, had gone to protest, and immediately thereafter there was litigation, involving among other things, the validity and priority of the indebtedness created by the receivers, trustees and managers, and especially the question of whether such indebtedness was binding upon the property of the Vermont and Canada Railroad Company. The master reports that the litigation referred to is that which was decided by the Supreme Court of Vermont in 1882, and reported under the title of *Langdon* v. *Vermont and Canada Railroad,* 54 Vt. 593. The construction of that decision the master properly submits to the Court.

The character of the indebtedness incurred by the receivership was a matter of discussion, but in *Langdon* v. *Railroad Company,* 54 Vt. 593, decided in 1882, which was but a continuation of the proceedings reported in the case of the same name in 53 Vt. 228, it was held, Judge Redfield delivering the opinion of the Court, that the property had been in the custody of receivers and managers as officers of the court continuously from 1861 to the date of the decision, 1882; and that

the bonds negotiable and outstanding were receivers' obligations which were, or might be declared, a charge in the nature of an equitable mortgage on the property the subject of the trust, and a decree was made looking to the settlement of the accounts of the receivers and the winding up of the receivership.

It appears from *Langdon* v. *Railroad Co.*, 53 Vt. 228, 260, that there were issued negotiated and outstanding of the various issues of receivership bonds $4,357,000; that of the authorized issue of Income and Extension Bonds of $2,500,000, there were issued negotiated and outsanding $680,900, which had been exchanged for a previous issue of bonds, and in addition $1,008,600, making in all the issued negotiated and outstanding Income and Extension Bonds $1,689,500, and leaving of the authorized issue $810,500, not appearing to the Court to be both issued and outstanding, and not treated by it as such; and since the Court was passing upon the whole situation necessarily declared to be not outstanding, and as a simple computation from the figures given shows, not entering into the sum of $4,357,000, referred to in the orator's exhibits as the total issue of trust bonds to be provided for.

In stating his case the orator refers to a plan of reorganization and consolidation of the Vermont Central Railroad and the Vermont and Canada Railroad and says that it was part of this plan that all the obligations created by the receivers, trustees, and managers, should be satisfied and taken care of. He refers to the plan which was promulgated by the American Loan & Trust Company of Boston, and makes it a part of his bill. The plan was promulgated, November, 1882.

The defendant admits the allegations with respect to this plan of reorganization and joins with the orator in referring to it. This plan so referred to and made a part of the case made provision for the satisfaction of the bonds of the receivers and managers amounting to $4,357,000 of bonds known respectively as Equipment, Income and Extension, Guaranteed, and Stanstead, Shefford and Chambly Bonds. The amount named corresponded to a cent to the amount of outstanding bonds of receivers and managers as shown by this Court in the 53 Vt. 228, on page 260, and so made provision for Income and Extension Bonds to the amount of $1,689,500 and no more, and assumed by the very terms of the plan which was to settle all disputes among the security holders that that sum and not $2,500,000

was the amount of Income and Extension Bonds negotiated and outstanding.

Of course there was nothing authoritative about this plan. But in further stating his case by allegations and exhibits referred to and made a part of the bill, the orator alleges that the plan of reorganization was assented to by the holders of a very large part of the claims of every description against the property in question, and that a petition was filed in the court of chancery looking to the reorganization of the property, and that afterwards, in 1884, a decree was rendered in accordance with the prayer of the petition. The petition and the decree are referred to by the orator and made a part of his bill, and the defendant admits the facts set forth in regard to such petition and decree and joins with the orator in referring to the petition and decree.

It appears by the petition that the whole issue of trust or receivers' bonds to be provided for was stated to be the sum previously stated by this Court, $4,357,000, and it appears that the decree was in accordance with the petition, that the receivers and managers were to be discharged and were ordered to turn over to the Consolidated Railroad Company of Vermont, a corporation organized in 1883, the entire property in question, and that provision was made for the satisfaction by the Consolidated Company of the claims embraced in the plan of reorganization and of no others. So the Court again determined the amount of the bonds of the receivers and managers issued and outstanding to be $4,357,000, and thereby fixed or undertook to fix the amount of Income and Extension Bonds negotiated, and lawfully outstanding at $1,689,500 and not at $2,500,000.

The master finds that Income and Extension Bonds to the full amount authorized, $2,500,000, were duly executed and issued. But he finds that some of them were delivered as collateral simply, and he finds that the five bonds in question were a part of a lot of $222,300 delivered in May, 1873, to J. Gregory Smith, one of the receivers, who raised $200,000 on his personal note with the bonds so delivered as collateral, and he finds that of these collateral bonds, seventeen, including the five in question, were delivered to Hoyt & McKinney as collateral for $10,000 of the loan, and that all the collateral so delivered to J. Gregory Smith were returned except the bonds pledged to Hoyt & McKinney, which the master says appear never to have

been returned although the loan for which they were pledged was paid in March, 1874.

The orator claims in his brief that it is entirely consistent with this finding, that the bonds were retained as security for some fresh loan, or because they were purchased by Hoyt & McKinney. But this claim is hardly more than a play upon words. If they were sold or again pledged they were in legal sense returned as a preliminary to such later transaction. This specific claim does not appear to have been made before the master, otherwise his language might have been more explicit; but as it reads it fairly means, that the pledgee's special title ceased, that there was a total failure of consideration, and that there was a good defence against the bonds. *Wilbur* v. *Prior*, 67 Vt. 508, 32 Atl. 474; *Blaney* v. *Pelton*, 60 Vt. 275, 13 Atl. 564; *Tinker* v. *Midland Valley Co.*, 231 U. S. 681, 58 L. ed. —, 34 Sup. Ct. 252.

Title is defective if a negotiable instrument is negotiated unlawfully or under circumstances which amount to a breach of faith. When commercial paper is held as collateral security merely, the holder has only a special property therein, and that ceases when the principal debt is paid, and the pledgee no longer has any interest in or title to the collateral note and no claim to enforce thereby and if he thereafter negotiates it, it is good only in the hands of a holder in due course.

When this Court, long after 1874, determined the amount of Income and Extension Bonds issued, negotiated, and outstanding, it made up the amount of two sums, $680,900 issued in exchange for other bonds, and $1,008,600 otherwise negotiated, and took no notice of any bonds which had been issued as collateral. It in effect thereby said that the bonds issued as collateral had either been returned or were unlawfully held, were not lawfully outstanding, and during all the subsequent proceedings which we have traced there is no suggestion of error in this respect, but on the other hand every circumstance is confirmatory.

But it is said that the defendant has not pleaded any defence to the bonds. The orator was probably entitled to a more specific answer, but under the general practice in equity his way to get that was by exceptions to the answer. *Blaisdell* v. *Stevens*, 16 Vt. 179, 186; *Ladd* v. *Campbell*, 56 Vt. 529; *Barrett* v. *Twin City Power Co.*, 111 Fed. 45.

And under our practice, Chancery Rule 27, where with an insufficient answer a case has gone to hearing, and the evidence has been taken or the facts have been found, the case is to be disposed of on appeal as finally made up. Here the defendant added to his answer allegations by way of a cross bill conformably to Chancery Rule 26. This cross bill the orator in the original bill might have demurred to if he chose, Chancery Rule 26, but he chose to answer the cross bill, and the whole case having been referred to a master who has reported, the orator is not entitled in this Court to have the case disposed of on bill and answer, but on appeal it will be treated as it was treated below. *McArthur* v. *Blondin,* 85 Vt. 516, 80 Atl. 663.

We proceed to the question of whether the orator is a holder in due course, a holder in good faith.

The Consolidated Railroad Company of Vermont was a company formed as a part of the scheme of reorganization. By the decree of January 17, 1884, the Central Vermont Railroad Company was discharged as receiver of the Vermont Central and the Vermont and Canada Companies and directed to turn over to the Consolidated Company the property held by it as receiver and manager. In accordance with this decree on the 30th of June, 1884, the receivership property was assigned and turned over to the Consolidated Company.

The exchange of bonds and preferred stock of the Consolidated Company for the earlier obligations, resting upon the the property, was carried on by the American Loan & Trust Company until the 5th day of February, 1892, when the work of exchange was nearly completed. At that time the Central Vermont Railroad Company was the holder and operator of the railroad property in question, and the work of making the small amount of exchange remaining to be done under the plan of reorganization was by the American Loan & Trust Company turned over to the Central Vermont Railroad Company.

In the spring of 1896 the Central Vermont Railroad Company became financially embarrassed, and in a suit against it brought by the Grand Trunk Railway Company, in the United States Circuit Court, the railroad property in question passed into the hands of receivers appointed by that Court. The receivers were Charles M. Hays and Edward C. Smith. This receivership continued until 1899, when it was terminated by a foreclosure sale made under the direction and control of the United

States Circuit Court.  The purchaser at this sale was the Central Vermont Railway Company, a corporation organized and existing by virtue of No. 159 of the Acts of 1898, of the Vermont Legislature.  It will be seen that, to an understanding of this case, it is necessary throughout to bear in mind the distinction between the Vermont Central Railroad Company, the Central Vermont Railroad Company, and the Central Vermont Railway Company, the last named corporation being the purchaser at the sale last mentioned and the present owner and holder of the property in question.

The present suit in equity was brought by the orator against the Central Vermont Railway Company, the present owner of the property, in 1902, after the expiration of the thirty years named in the Income and Extension Bonds issued by the receivers and managers in 1872.

The judicial sale by the direction and under the supervision of the United States Circuit Court made provision for the payment of the bonds of the Consolidated Company which had been issued in exchange for the Income and Extension Bonds, but not for the payment of the latter bonds.  However, we assume without deciding that, as the orator claims, notwithstanding the vicissitudes of the property, the orator is entitled to prevail in this suit if he is, within the meaning of the law, a *bona fide* holder for value of the five bonds in question without notice of defence.  See *Northern Pacific R. Co.* v. *Boyd,* 228 U. S. 482, 57 L. ed. 931, 33 Sup. Ct. 554.

The orator obtained the five bonds in suit of one William Jurgenson, of New York.  They were offered to him May 17, 1899, in connection with other choses in action.  Before buying the bonds the orator consulted Poor's Manual, and found therein a pretty full history of the railroad property down to the reorganization of 1884.  Among other things he found that, of the bonds issued in exchange for previous liabilities, the familiar sum of $4,357,000 was to be exchanged for a like amount of "equipment" "Income and Extension" "guaranteed" and "Stanstead, Shefford & Chambly" bonds dollar for dollar, holders of such bonds to relinquish all claims for overdue interest on the same.

The litigation in the course of which the Income and Extension Bonds were issued is referred to, and the decision of this Court rendered in 1882 is also referred to.  That is the case

of *Langdon* v. *Railroad Co.*, 54 Vt. 593, and that case refers for the facts to the case of *Langdon* v. *Railroad Co.*, 53 Vt. 228, and quotes from the decision therein. The case in the 54th Vt. is in fact, and appears on its face to be, supplementary to the decision in the 53rd Vermont. So the orator was given notice that not the whole issue of Income and Extension Bonds, namely $2,500,000, was lawfully outstanding, but that of that issue only $1,689,500 had been considered by the Court to be lawfully outstanding. Without reference to Poor's Manual the orator was put upon inquiry as to the litigation in the course of which the obligations were issued both as to prior and subsequent proceedings therein. *Mercantile Trust Co.* v. *Kanawha &c. R. Co.*, 58 Fed. 6, 7 C. C. A. 3. Opinion by Taft, Circuit Judge.

Here in consequence of the nature of the obligation as it was made to appear on the face of the instruments and by the indorsement of the decree thereon, and by the information obtained from Poor's Manual, the orator was most emphatically put upon inquiry as to the litigation in the course of which the Income and Extension Bonds were issued.

In addition to examining Poor's Manual the orator wrote Mr. E. C. Smith, addressing him as receiver of the Central Vermont Railroad, saying that he held $5,000, of the Income and Extension Bonds and asking to be advised if those bonds were convertible into any of the securities of the Central Vermont or if they had any value at all. He closed by saying that he would be very glad to sell. Mr. Smith replied by referring the orator to the American Loan & Trust Company, saying that it would give information as to what should be done with respect to the exchange of the bonds referred to, explaining their exchangeability into five per cent. bonds under the reorganization of 1884, and the exchangeability of those five per cent. bonds into four per cent. bonds of the Central Vermont Railway Company under the reorganization of 1898. The letter closed thus: "I have no doubt the American Loan & Trust Company will arrange for the exchange of your bonds into the Consolidated Bonds, and later into the four per cent. bonds when issued, or will very likely find you a customer for them if you desire to sell." Both the orator's letter and the reply contemplated the status of the issue of Income and Extension Bonds in general, and nothing is said which has any reference to any particular bonds of that issue.

After receiving this reply the orator bought the five bonds of Jurgenson or of him and an unnamed man whom Jurgenson claimed had some interest in them and who was present at the sale. As a part of the transaction the orator acquired a joint interest with Jurgenson in other securities of what the master denominates "the same bunch," these other securities to be held by Jurgenson until the orator should find a purchaser for them, the proceeds of any sale when made to be divided equally, after the deduction of all expenses connected therewith. The orator expended from $100 to $300, in trying to make collection of these other securities. When the orator bought the five bonds. Jurgenson said that he bought them from the estate of William H. Guion, or that his friend the man with him so bought them. Nothing further was shown as to the purchase of the bonds by Jurgenson except that it appears from the report of the master that in purchasing the bonds the orator was dealing with a man with whom he had had no previous acquaintance or dealings, that Jurgenson's price for the bonds was $225, that the unknown man with Jurgenson, who claimed to have some interest in the bonds, required more, and that the demand of this unidentified man led to the raising of the price from $225, to $275.

On the day of the purchase of the bonds by the orator, that is, June 2, 1899, but after the transaction of sale and purchase, the orator wrote the American Loan & Trust Company that he held certain of the Income and Extension Bonds and that he had been advised by Mr. E. C. Smith, receiver, that they were exchangeable through the Trust Company for five per cent. bonds under the reorganization of 1884, and that such bonds could be exchanged for four per cent. mortgage bonds when the latter were issued. He asked the Trust Company to advise him regarding the exchange and to advise him if he was entitled to any back interest or coupons, saying "I note the bonds which I should have received some time ago have been paying interest." On the same day he sent the Trust Company a telegram which read: "Please answer my letter of this date fully by wire at my expense as soon as possible." The company by telegram and a letter of confirmation promptly informed the orator that its authority regarding the exchange inquired about had ceased several years before, and that all exchanges made since the time referred to had been made by the Central Vermont Railroad Company or its receivers.

Thereafter the orator was referred by one of such receivers to Charles M. Wilds, Esq., who was their attorney; and under date of June 9, 1899, seven days after the purchase, the orator wrote to Mr. Wilds saying that Mr. E. C. Smith had referred him to Mr. Wilds in the matter of these Income and Extension Bonds; that he desired to realize on the bonds promptly and would be glad to pay any reasonable fee, that he had sent Mr. Smith the full particulars regarding the bonds but would furnish any further details. Mr. Wilds replied repelling the suggestion of a fee by saying "I cannot act as your counsel in the matter." Mr. Wilds proceeded to say that if the bonds were entitled to conversion he would endeavor to see that the orator was not embarrassed in the matter. He asked for the history of the bonds. Down to this time in addressing both Mr. Wilds and Mr. Smith the orator represented himself as holding or owning the bonds, making the same representation in that regard both before and after he bought them. In reply to the letter of Mr. Wilds asking for the history of the bonds the orator did not claim to own them but said that "his client" did not convert the bonds because he was not familiar with such things, and that after holding them for a long time and getting no interest the client asked a broker about them who said they had no value, and so the client laid them away for years; but that this friend, referring to the client, had recently met with misfortune and showed the bonds to the orator who had advanced money on them.

The letter is a rather long one and need not be quoted as it gives nothing that is both authentic and material about the history of the bonds as to which the orator had professed his willingness to give details.

The above narrative of the history of the bonds which the orator professed a willingness to give was in every particular untrue to the knowledge of the orator.

Mr. Wilds replied by saying among other things: "Will you not have the kindness to give me the name of the owner of the securities which you wish to convert? I do not understand —as you would perhaps infer from Governor Smith's letter—that the conversion can be accomplished as a matter of course."

The orator then wrote Mr. Wilds that of course he could not give the name of his "customer," that he didn't see what that had to do with the matter, that Governor Smith's letter would

lead any one to suppose there was no difficulty about the matter, that if there were any objections to the bonds he would like to know it. He made further reference as to his standing. He did not say that the bonds were his rather than those of a client, but said by way of postscript that they might be considered his for all practical purposes as they were in his possession with full authority to dispose of them.

Mr. Wilds' reply, omitting address and signature, we give in full. It is as follows: "Your favor of June 16 is at hand. My purpose in wishing to know the name of your customer is to trace the history of the securities in question. Without knowing the entire history of these securities, I can give you no satisfaction in the matter. I hasten to assure you that your standing is in no way involved in the matter, and that the Central Vermont Railway Company will be very glad to recognize its legal obligation in the matter, but in order to do so, the history of these securities must be examined." To this letter the orator made no reply.

He, however, filed an intervening petition in the United States Circuit Court for the District of Vermont in the suit of the *Grand Trunk Railway* v. *Vermont Central Railroad Company*, already referred to, and sought to have the lien which he now here claims therein established. After a hearing upon such petition it was denied without prejudice.

The master finds the orator chargeable with notice that the bonds at the time of his purchase of them were not in the hands of a *bona fide* holder for value unless the unpaid coupons, attached to them, the information obtained in Poor's Manual, the small price paid, and the orator's misstatements to Mr. Wilds, or these facts taken together were no evidence on which to base such a finding. The master also in another place reports that in making the above finding he further took into consideration the conduct of the orator, especially in withholding the true history of the bonds so far as that was known to him, and in keeping back a specific description of them by serial numbers, which, the master says, would if given have enabled the defendant to trace their history. The master also makes the following finding: "The defendant requests that I find and I do find that the orator was not a *bona fide* purchaser for value, and that when he presented the said bonds for payment he was not and is not now a *bona fide* holder for value of the same."

These findings are challenged on the ground that they are not warranted by the subordinate facts and findings on which they are based. The information which the orator got from Poor's Manual, emphasized the orator's duty to inquire as to the proceedings in the course of which the issue of Income and Extension Bonds was made. The inquiry followed up showed that not the whole issue of $2,500,000 of Income and Extension Bonds had been treated by the Court as lawfully outstanding; but that information gave him knowledge, or the equivalent of knowledge, that the amount of such bonds lawfully outstanding was $680,900 less than the maximum limit of the authorized issue, and was so treated in the plan of reorganization and the decree in accordance therewith made January 17, 1884, to both of which the orator refers and appeals. So he was given notice that though his bonds had been issued they might not be lawfully outstanding, and that though fifteen years had run since the exchange under the reorganization had begun his bonds had not for some reason been exchanged.

Mere inadequacy of price might not have been a circumstance for consideration. But the purchase for two or three hundred dollars of bonds which with the unpaid coupons attached thereto amounted to many thousands of dollars was a circumstance which the master was entitled to consider in connection with other circumstances. *Parsons* v. *Jackson,* 99 U. S. 434, 441, 25 L. ed. 457.

The mere circumstance that unpaid coupons were attached to the bonds was probably not entitled to any consideration. But here there were at the time of the purchase forty-six unpaid coupons attached to each bond representing interest promised to be paid but which had remained unpaid during a period of twenty-three years, the last fifteen of which covered the period since the reorganization of 1884. The coupons represented the chief part of the obligations which the orator was purchasing, and the master was entitled to consider these unpaid coupons in connection with the other circumstances.

The master also took into consideration the orator's misstatements to Mr. Wilds and the fact that he withheld the true history of the bonds so far as it was known to him, and detailed a fictitious history, the fact that having expressed his willingness to detail the history of the bonds he concocted and put forth the untrue story which we have already referred to and with-

held the few facts about the bonds and his purchase of them which he did know. But it is said by the orator that as his correspondence with Mr. Wilds followed his purchase of the bonds it is no evidence that he became their holder in bad faith. But one's belief and knowledge at one time is often evidence of his belief and knowledge at a closely related time.

The orator's conduct in concealing and misrepresenting the character of the transaction had in the circumstances a tendency to show that the transaction had been consummated in bad faith, just as one's conduct in concealing stolen goods and making misrepresentations as to his acquirement of them may tend to show that he received them knowing them to be stolen. There does not seem to be any doubt as to the principle or its application here. It would be a strange thing to say that in law one cannot reason back from false statements and guilty conduct to a guilty or *mala fide* act as their explanation. The books are too full of illustrations of the principle to make it worth while to single out cases for citation, and the matter is one of straight reasoning and does not require the support of precedents.

The findings of the master relating to bad faith were amply warranted by the subordinate facts found. *Pierson* v. *Huntington*, 82 Vt. 482, 7 Atl. 88, 29 L. R. A. (N. S.) 695, 137 Am. St. Rep. 1029; *Capital Savings Bank* v. *Montpelier Savings Bank*, 77 Vt. 189, 59 Atl. 827; *Limerick Nat. Bank* v. *Adams*, 70 Vt. 132, 40 Atl. 166; *Stevenson* v. *Gunning's Est.*, 64 Vt. 601, 25 Atl. 697; *Bromley* v. *Hawley*, 60 Vt. 46, 12 Atl. 220; *Ormsbee* v. *Howe*, 54 Vt. 182, 41 Am. St. Rep. 841; *Gould* v. *Stevens*, 43 Vt. 125, 5 Am. Rep. 265; *Clough* v. *Patrick*, 37 Vt. 421; *Goodman* v. *Simons*, 20 How. 343, 367, 15 L. ed. 934; *Vosburgh* v. *Diefendorf*, 119 N. Y. 357, 23 N. E. 801, 16 Am. St. Rep. 836; *Parsons* v. *Utica Cement Co.*, 73 Atl. 785, 135 Am. St. Rep. 278; *Tilden* v. *Barnard*, 43 Mich. 376, 5 N. W. 420, 38 Am. Rep. 197; *Perkins* v. *Prout*, 47 N. H. 387, 93 Am. Dec. 449; *Kellogg* v. *Curtis*, 69 Me. 212, 31 Am. Rep. 273; *National &c. Bank* v. *Morse*, 163 Mass. 383, 40 N. E. 180.

Bad faith may be and usually is evidenced by circumstances, and a number of circumstances all pointing in the same direction often afford strong proof where each circumstance taken by itself is of slight weight. *Barney* v. *Quaker Oats Co.*, 85 Vt. 372, 384, 82 Atl. 113; *Lawrie* v. *Silsby*, 82 Vt. 505, 509, 74 Atl. 94.

This case was tried before the enactment of the negotiable instruments act which took effect June 1, 1913, and if the act referred to applies to instruments of the character of these bonds, it is immaterial to consider it here, for by the express provision of the act it does not apply to instruments made and delivered prior to the taking effect thereof. Acts of 1912, No. 114.

In saying this we do not say that the question of bad faith would stand any different under the existing law than under the former law. We make this suggestion only as a guard against any misconstruction of the decision.

The defendant insists that the orator was barred by the statute of limitations, the staleness of the claim and the laches of the orator and his predecessors in title. We have taken no notice of these claims as the conclusion reached renders such consideration immaterial.

The orator took eleven exceptions to the master's report. Exception 1, was to a finding by the master that the orator's conduct fell far short of the conduct of a prudent man claiming that the finding was not warranted by the evidence. The finding was warranted, but we predicate nothing on it, and so we do not discuss it. Exceptions 2, 3, 4 and 9 relate to the findings as to bad faith and raise no question not already considered. Exceptions 5, 6 and 7 were taken because the master received and considered the testimony of E. C. Smith, against objection and exception on the part of the orator; and against like objection and exception received and considered certain books of account of the old receivership, and based certain findings on the evidence so received.

Mr. Smith testified that he was continuously associated with the property from 1871, from 1871 to 1877 with his father John Gregory Smith, one of the receivers, without holding any official position, being away at college and law school except during vacations. After 1877, he testified that he had been associated with the property as attorney for the Central Vermont Railroad Company, director, vice-president and president successively and as one of the receivers appointed by the United States Circuit Court in 1896, acting as such at the time of the hearing, and having the custody of the books. His testimony tended to show that the books were books of original entries made by the proper persons to make them whose handwriting he identified, they being dead as well as all of the receivers, five in number, who

signed the Income and Extension Bonds. Some matters in question he testified to as of his own knowledge, among them the fact that $17,000 of the Income and Extension Bonds were pledged to Hoyt & McKinney, and his testimony and the books taken together tended to sustain the findings of the master with regard to the pledging of these bonds, the payment of the debt for which they were pledged as security and the fact of their non-return notwithstanding such payment. It is claimed that much of Mr. Smith's testimony was hearsay and incompetent. But it does not so appear. His examination and cross-examination do not afford a basis for the claim now made. It is claimed that the books received were inadmissible under the rule that excludes mere memoranda or diaries as independent evidence. But the books are in their general character account books. The master seems to have made a proper and discriminating use of the books. Being requested by the orator to state in the report that certain findings were based in whole or in part on testimony introduced subject to exception by the orator, the master refused to comply with the request as worded, but reported that the findings referred to were based upon the testimony of Edward Curtis Smith and the original entries in the books of account made in the regular course of business by persons now dead, and received in connection with Mr. Smith's testimony. No error appears in the matter of the use of the books. *Bacon* v. *Vaughan*, 34 Vt. 73; *State* v. *Phair*, 48 Vt. 366; *Green* v. *Will's Estate*, 60 Vt. 440, 14 Atl. 5; *Gifford* v. *Thomas' Estate*, 62 Vt. 34, 36, 19 Atl. 1088; *Gleason* v. *Kinney's Admr.*, 65 Vt. 560, 27 Atl. 203; *In re Diggin's Estate*, 68 Vt. 198, 34 Atl. 696; *Welch* v. *Ricker*, 69 Vt. 239, 242, 39 Atl. 200; *Post* v. *Kennerson*, 72 Vt. 341, 47 Atl. 1072, 52 L. R. A. 552, 82 Am. St. Rep. 948; *Coolidge* v. *Taylor*, 85 Vt. 39, 80 Atl. 1038; *Osborne* v. *Grand Trunk Ry. Co.*, 87 Vt. 104, 88 Atl. 512; *Griffin* v. *Boston & Maine*, 87 Vt. 278, 292, 89 Atl. 220.

The orator in his brief says as to one of the books that it was relied on not so much for what it contains as for what it does not contain, and claims briefly that it was incompetent for the purpose of showing what it does not contain. The rule that a party's books are not evidence in his favor except as to what they show affirmatively has been in this State cautiously acted upon with a recognition that it has exceptions. *Scott* v. *Bailey*, 73 Vt. 49, 51, 50 Atl. 557; *Cross* v. *Willard*, 46 Vt. 73; *Mattocks*

v. *Lyman*, 18 Vt. 78, 46 Am. Dec. 138; *Missisquoi Bank* v. *Evarts*, 45 Vt. 293.

But the books of a receiver are not the books of a party, for the receiver is the arm or instrument of the court. And the receivers whose books are in question sustained such a character and it was finally directly decided that their acts were the acts of the court of chancery. *Langdon* v. *Vermont and Canada R. Co.*, 54 Vt. 593, 598, 608, 613.

Receivership books are not the books of a party but are the books of the court accessible to everybody interested in the entries made therein. *Union Trust Co.* v. *Illinois &c. Co.*, 117 U. S. 434, 436, 29 L. ed. 693, 6 Sup. Ct. 809.

The rule with regard to the private books of a party ought not, to say the least, to be extended, 2 Wigmore Ev. 1531, 1556, and certainly in the case of the books of receivers, the absence of an entry ought to be given such probative force as from an examination of the books it appears that it ought to have. Where one is charged with a duty of an official character, as to make entries of transactions on receiver's books, there is usually an inference more or less strong that he has done his duty and made such entries or performed such things as his duty required him to make and perform.

The orator's exception 8 relates to a finding by the master that certain books introduced by the defendant were ancient documents and that the entries therein were made in the due and regular course of business by persons now dead. The orator does not dispute that such persons were dead before the time of the hearing. There was as we have seen enough to warrant a finding that the entries were made in the due and regular course of the business of the receivers. The orator does not question the finding that the books were to be regarded as ancient documents. But he says that the doctrine of ancient documents relates only to the authentication of such documents. We assume this to be so, but it doesn't appear that the master treated it otherwise, or indeed that he applied it to that extent. The authentication seems to have been by the testimony of E. C. Smith who testified to a knowledge of the handwriting of the men who kept the books and made the entries, and who further testified to the course of business, he having apparently had sufficient opportunity, interest and knowledge to enable him to do so.

The orator's 10th exception was to the refusal of the master to comply with four certain requests so far as they were not complied with. The orator's 11th and last request was for errors, not in any way indicated, manifest on the face of the report. These two exceptions are altogether too vague. The orator does not argue them. He says in his brief that he does not waive any of his exceptions, but he does in fact waive these by not briefing them.

As a part of the final decree the defendants' demurrer was overruled. This had already been done, and although the benefit of the demurrer was reserved until the final hearing, that action did not formally reinstate the demurrer, but only reserved to the defendant the right thereafter to raise and insist upon all the questions made under the demurrer. In such circumstances the final decree is upon the whole case as finally made up and it is a technical error, which we note in the interest of good practice, to consider the demurrer separately and overrule it again. See *Savings Bank* v. *Capital Savings Bank,* 77 Vt. 123, 59 Atl. 197, 107 Am. St. Rep. 754.

The matter of the cross bill so far as established entitled the complainant therein, the defendant against the original bill, to affirmative relief against the assertion of the claim we have considered, but the prayer goes too far, particularly in asking relief against any and all claims of the orator in the original bill. What other claims he may have we are of course unable to tell.

*The pro forma decree is reversed and the cause is remanded with directions that the orator's bill be dismissed, and that a decree be rendered granting the relief prayed for in the cross bill so far, and only so far, as the prayer is for relief against the claim herein considered.*