El Dorado Nat'l Bank v. Butler County State Bank.

No. 26,384.

THE EL DORADO NATIONAL BANK, *Appellant*, v. THE BUTLER COUNTY STATE BANK and WILLIAM DOCKING, Receiver, *Appellees*.

SYLLABUS BY THE COURT.

BANKS AND BANKING—*Insolvency—Preferred Claim—Draft as Pro Rata Assignment—Pleadings*. Where one bank notified another in the same city that it would require payment in cash of any balance due on that day's clearing, and upon the amount being ascertained accepted a draft upon a bank in another city, which upon being presented the next day was refused payment because the bank issuing it had been closed by the state bank commissioner, it is held that no agreement that the draft should operate as a *pro rata* assignment, and no ground for treating it as a preferred claim against the assets of the drawer in the hands of a receiver, are shown by allegations in a pleading that at the time of the acceptance of the draft the representative of the drawer said that it had sufficient funds on deposit to meet it, that it would preserve such funds, "that the same should be applied to the payment of said draft, and that said draft would be paid out of such specific funds."

Appeal from Butler district court, division No. 1; ALLISON T. AYRES, judge. Opinion filed January 9, 1926. Affirmed.

*Bennett R. Wheeler, S. M. Brewster, John L. Hunt*, all of Topeka, and *C. L. Harris*, of El Dorado, for the appellant.

*C. H. Brooks, Willard Brooks, Howard T. Fleeson* and *William H. Hitchcock*, all of Wichita, for the appellees.

The opinion of the court was delivered by

MASON, J.: On the morning of March 30, 1923, the Butler County State Bank, of El Dorado, was taken charge of by the state bank commissioner, and later a receiver was appointed to wind up its affairs. On the day before, March 29, the bank was found upon clearing to be indebted to the El Dorado National Bank for checks and collections in the sum of $11,503.87, for which it gave a draft for that amount upon a Kansas City bank where it had a deposit in excess thereof. On March 30 this draft was presented to the Kansas City bank for payment, which was refused, obviously because that bank had notice of the commissioner having taken charge of the state bank. The deposit was later turned over to the receiver. This action is brought by the El Dorado National Bank to require

Assignments, 5 C. J. pp. 901 n. 66, 920 n. 62, 925 n. 85; 2 L. R. A. n. s. 83; 5 A. L. R. 1667; 5 R. C. L. 491. Banks and Banking, 7 C. J. p. 673 n. 75.

the receiver to pay the draft, upon the theory that the circumstances under which it had been accepted had in equity the effect of a valid oral assignment of that much of the money on deposit in the Kansas City bank. A demurrer to the petition was sustained, and the plaintiff appeals.

The petition sets out these facts: Before the amount of the balance on clearing had been ascertained, on March 29, the plaintiff notified the Butler County State Bank that it would require payment thereof in cash. The state bank then orally made these statements and representations, in reliance upon which the plaintiff accepted the draft on the Kansas City bank in exchange for the checks and other collections it held:

"That said Butler County State Bank had on deposit in the Commercial National Bank of Kansas City, Kan., one of its correspondents, sufficient funds for the payment of the draft that would be issued by said Butler County State Bank to plaintiff for the balance due it on that day's clearance, and that said Butler County State Bank would preserve such funds, that the same should be applied to the payment of said draft, and that said draft would be paid out of such specific funds."

This court has held that a check or draft does not of itself operate as an assignment to the payee of a part of the deposit against which it is drawn, and that if it is outstanding when the bank passes into the hands of a receiver or like custodian the holder stands upon no better footing than an ordinary creditor. (*Clark v. Bank,* 72 Kan. 1, 82 Pac. 582.) That ruling is not here questioned, and was the prevailing doctrine even before the adoption of the uniform negotiable instrument act containing this section:

"A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder, unless and until it accepts or certifies the check." (R. S. 52-1706.)

Some of the courts which had formerly given the holder of an outstanding draft a preference over ordinary creditors have adhered to the same view notwithstanding that statutory provision. (Notes, 2 L. R. A., n. s. 83, 86; 5 A. L. R. 1667, 1668; 2 Daniel on Negotiable Instruments, § 1643, note 73; *McClain & Norvet v. Torkelson,* 187 Ia. 202.)

Assuming that by an oral agreement made at the time of the giving of a check the entire transaction may be given the effect of a *pro tanto* assignment (as to which see 5 C. J. 918-922), we think the facts pleaded do not bring this case within that rule or upon equi-

table grounds entitle the plaintiff to a preference over depositors and other creditors of the bank. If it had really been the purpose of the representatives of the two banks at El Dorado to agree that the title to $11,288.32 of the deposit of the state bank in the Kansas City bank should at once pass to the national bank, it would have been a very simple and easy matter to so express that intention as to make such meaning clear. The failure to use the term assignment or some related word, or to employ other language suggesting the immediate passing of title militates strongly against the plaintiff's claim. The representation that there were funds on hand in the Kansas City bank to meet the draft does not tend to show any agreement not indicated on its face. The mere giving of a check implies (in the absence of an understanding to the contrary) that there are funds on deposit to meet it; and such legal effect has been given to it. (See *Boxer v. Kirkwood*, 119 Kan. 735, 736, 241 Pac. 451.) A check *purports* to be drawn on a deposit of funds (7 C. J. 673; 5 R. C. L. 481, 483), whether it actually is or not. The statements that the state bank would preserve the funds then on deposit, that they should be applied to the payment of the draft, and that the draft would be paid out of such specific funds, were promissory rather than immediately effective. They were mere assurances that the draft would be paid—that the drawer would not attempt to evade the obligation it had assumed and make the giving of the draft fruitless by stopping payment or withdrawing the funds or undertaking to appropriate them to some other purpose. If it were not that checks are ordinarily received upon that understanding their currency would be greatly restricted, with manifest detriment to commercial interests. The fund upon which this draft was drawn was what the drawer had on deposit subject to check, and its essential character could not be affected by calling it a specific fund. It is true a plausible argument can be made in support of the plaintiff's claim to the consideration of a cause of equity. But the same argument applies with equal force wherever a check is given upon a bank which suspends payment before with due diligence it can be presented. The considerations back of it are substantially those supporting the view that a check should be treated as having the effect of an assignment, which one authority declares to be favored "by all the advanced, clear, independent thought and reasoning." (2 Morse on Banks and Banking, 5th ed., § 494.)

Joseph Story said of checks:

"They are always supposed to be drawn upon a previous deposit of funds, and are an absolute appropriation of so much money in the hands of the bank or bankers to the holder of the check, to remain there until called for, and cannot, therefore, be afterwards withdrawn by the drawer." (Story on Promissory Notes, 5th ed., § 489, p. 640.)

If the rule that an ordinary check is not to be regarded as an assignment is to be given any considerable practical effect, its operation should not be suspended by a conversation such as that here pleaded, for almost any talk between the drawer and payee conveying assurance of the check being good could be urged to that end with equal force, and cases of the application of the ordinary rule would be rare. Of the relative equities of the check holder and general creditors it has been said:

"It is not easy to see any valid reason why the assignment of an insolvent debtor, for the equal benefit of all his creditors, and all his property, does not confer on those creditors an equity equal to that of the holder of an unpaid check upon his banker. The holder of this check comes into the distribution of the funds in the hands of the assignee for his share of those funds with other creditors. The mere fact that he had received a check, a few days before the making of the assignment, on the bank, which had not been presented until after the general assignment was made and notified to the bank, does not seem, in and of itself, to give any such superiority of right. The assignment was complete and perfect, and vested in the assignee the right to all the property of the assignor immediately upon its execution and delivery, with due formalities, to the assignee, and the check of this assignee, like the check of Israel & Co., could have been paid by the bank with safety, if first presented. The check given by the same assignor a few days before was only an acknowledgment of a debt by that assignor, and became no valid claim upon the funds against which it was drawn until the holder of those funds was notified of its existence. . . .

"For these reasons we are of opinion that at the time of the presentation of the check to the bank, the bank held no funds subject to its payment, whether we consider the delivery of it by C. W. Israel & Co. to Schuler as intended to create an equitable assignment or not." (*Laclede Bank v. Schuler,* 120 U. S. 515, 517.)

It might be said here, as it was in *Eastman Kodak Co. v. National Park Bank,* 231 Fed. 320, affirmed in 247 Fed. 1002:

"I think it an extremely pernicious thing to throw doubt upon the scope of doctrines governing negotiable paper which, though a mere skeleton of expression, is among the most useful inventions of mankind. To seek too readily for exceptions from the well-settled rules upon this branch of the law in pursuit of a supposed equity, which incidentally does not exist here,

is an evidence of insufficient understanding of the economies of finance and their immense value to industry.

⸱     ⸱     ⸱     ⸱     ⸱     ⸱     ⸱     ⸱     ⸱     ⸱     ⸱     ⸱     ⸱     ⸱     ⸱     ⸱

"The plaintiff makes much of its supposed equities, but I confess I can find no reason to prefer it against other creditors, whose money was no doubt as dear to them as the plaintiff's was to it. They bought a check, nothing more, nothing less. They knew what a check was, and that in buying it they got nothing whatever but the credit of the drawer until they got it paid. Just what the injustice is in keeping them in the same class with other creditors who equally took the chances of the drawer's credit is not apparent to me." (pp. 324-325.)

However much may plausibly be said of the equities of one who takes a check in the confident and justifiable expectation that it will be paid, the policy of the state as evidenced by the section of the negotiable instrument act already quoted is to have equal regard for the welfare of depositors and other creditors. (See, also, *Bank v. Bank,* 98 Kan. 109, 157 Pac. 392.)

The present case is distinguishable from, although having much in common with, *Fourth Street Bank v. Yardley,* 165 U. S. 634, where the Fourth Street Bank, of Philadelphia, gave to the Keystone Bank, of the same place, $25,000 in gold certificates in exchange for its draft upon a New York bank for a like amount, and was held upon equitable considerations to have a preferred claim against the assets of the drawer in the hands of a receiver. That the Yardley case involved a somewhat extreme application of the principle invoked is evident from the fact that three justices dissented from the decision. It was based upon the particular and unusual facts of the case, one of which was that the transaction was an isolated one in which the Fourth Street Bank made a gratuitous loan because of the financial embarrassment of the Keystone Bank. In the opinion it was said:

"When we look at the situation of the parties and the character of the transaction disclosed by the facts just referred to, no difficulty is experienced in ascertaining the intent of the parties. Both were banking institutions—banks of deposit. They were located in the same city. They were not correspondents the one with the other, and there was no deposit account kept by the one with the other; indeed, so far as the usual course of commercial transactions was concerned, the banks were strangers. The application therefore by the Keystone Bank to the Fourth Street Bank for accommodation under these circumstances precludes the conception that the relation between the parties was purely one of a usual and customary nature.

"It cannot be doubted that a mere request for the loan by the Keystone

Bank from the Fourth Street Bank would have been so surprising that the contract would not possibly have been made without a statement of the reasons which rendered the request necessary. It is equally clear that the mere statement of the situation which caused the request to be made would, in itself, from any standpoint of business prudence, have made it the duty of the Fourth Street Bank to refuse without full security. It follows that the same reason which imperatively required the Keystone Bank to disclose the cause for its request, also rendered it absolutely essential, in order to obtain the loan, that it indicate a specific source or means of payment outside of and beyond its mere general credit. In other words, that it should tender ample security for the loan which it requested." (p. 651.)

In the instant case the plaintiff, at the inception of the transaction involved, was virtually a creditor of the Butler County State Bank. It held for its customers and correspondents checks and other items against it which obviously there was doubt of its being able to collect. If it had insisted upon cash payment, as it had given notice it would do, it might have precipitated the immediate suspension of payments. It gave up a claim of doubtful security for one which was apparently secure—was entirely secure unless, as happened, the Butler County State Bank should be closed before the draft could be presented to the bank in Kansas City. Plainly the plaintiff is not entitled to the same consideration at the hands of a court of equity as the Fourth Street Bank, which voluntarily turned over the actual cash to its embarrassed neighbor as a matter of accommodation. It is in the position of a creditor seeking the fruits of an incompleted preference by a debtor on the point of failure.

In *In re Hollins,* 215 Fed. 41, cited by the plaintiff, the draft involved was not drawn against a deposit of money and therefore had rather the character of an ordinary bill of exchange than a bank check or draft. It was secured by collateral previously deposited. The court said:

"If one without more agrees to give security upon specific property, the agreement to give the security in itself creates an equitable lien. If as an inducement to purchase drafts the buyer is given to understand that securities have been deposited to provide for the payment of the drafts offered for sale and on the faith of that understanding the drafts are purchased, as between the buyer and the seller an equitable lien is created which gives the buyer of the drafts a right to have them paid out of the securities so deposited. As this would be the right as against the seller it is the right as against the receiver of the seller." (p. 45.)

The other cases cited and quoted from in the plaintiff's brief

(*Walker v. Brown,* 165 U. S. 654; *Parlin & Orendorff Implement Co. v. Moulden,* 228 Fed. 111; *Ketchum v. St. Louis,* 101 U. S. 306; *De Winter v. Thomas,* 34 App. D. C. 80; *In re Interborough Consol. Corporation,* 288 Fed. 334) apply or discuss the general principle stated in the foregoing quotation, the case last cited being fully annotated in 32 A. L. R. 950.

The judgment is affirmed.