ROBERT L. LEACH, State Superintendent of Banking, Appellee, v. MECHANICS SAVINGS BANK, Appellee; IOWA NATIONAL BANK et al., Claimants, Appellants.

**BILLS AND NOTES:** Drafts and Checks—Operation and Effect as to Assignment. The issuance of a draft works no equitable assignment to the payee of the funds of the drawer in the hands of the drawee, and consequently, in case of the subsequent insolvency of the drawer, the payee is not a *preferred* creditor, (1) even though the drawer at once charges himself and credits the drawee with the amount of the draft, (2) even though the draft was issued by the drawer in payment of checks drawn upon himself by his depositors, whom he at once charges with the amounts of their checks, and (3) *even though the controversy over the funds is solely between the receiver of the insolvent drawer of the draft and the payee of the draft.*

ALBERT and MORLING, JJ., dissent.

**BILLS AND NOTES:** Drafts and Checks—Distinction. The distinguishing feature between a "check" and a "draft" is that in a draft the drawer is a *bank*, while in a check the drawer is an *individual*.

Headnote 1: 5 C. J. pp. 916, 919, 920, 921; 7 C. J. p. 751. Headnote 2: 8 C. J. pp. 37, 41; 11 C. J. p. 748; 19 C. J. p. 598.

Headnote 1: 5 A. L. R. 1667; 5 R. C. L. 495.

*Appeal from Polk District Court.*—JOSEPH E. MEYER, Judge.

DECEMBER 14, 1926.

Action against the receiver, to fix the status of certain claims filed by the Iowa National Bank, McCutchen & Standring Company, and the receiver for the Commercial Savings Bank. Each of these claims was allowed as a depositor's claim, but

each was denied preference. The claimants appeal because the district court refused to allow their claims as preferred.— *Affirmed.*

*E. D. Perry,* for Robert L. Leach, Receiver of Commercial Savings Bank, Appellant.

*Clinton L. Nourse,* for Iowa National Bank and McCutchen & Standring Company, Appellants.

*Ben J. Gibson,* Attorney-general, and *S. S. Faville,* Assistant Attorney-general, for Robert L. Leach, Superintendent of Banking, Appellee.

*John L. Gillespie,* for Robert L. Leach, Receiver of Mechanics Savings Bank, appellee.

DE GRAFF, C. J.—Two primary questions are propounded on this appeal. First: Does a draft drawn in the ordinary form constitute an assignment *pro tanto,* in law or in equity, of the funds in the hands of the drawee to the credit of the drawer before the acceptance or certification of such draft? Second: Do the record facts, other than the mere execution and delivery of the drafts involved in this action, disclose and constitute an assignment of the funds in question so that a court of equity will recognize the holder's claim as superior to that of the receiver of the drawer, appointed after the issuance of the drafts, but before their presentation to the drawee?

1. BILLS AND NOTES: drafts and checks: operation and effect as to assignment.

The first question calls for the interpretation of Sections 127 and 189 of the Uniform Negotiable Instruments Act, adopted by the legislature of Iowa in 1902 (Sections 9588 and 9650, Code of 1924). The second question must be answered on the fact side of the instant case. If the first question is answered in the affirmative, then there is no occasion to direct our inquiry to the second question.

The instant facts are undisputed, and the issues are within narrow compass. The parties in suit are well defined, and involve only the claimants, who are payees in certain drafts, and the drawer, now represented by a receiver, whose rights, it may be conceded, are no higher or better than those of the

drawer, the Mechanics Savings Bank.  The dispute is to the title to a fund, and is simmered down to a controversy between the payee-holders of the drafts and the drawer thereof.  In brief, the inquiry is:  Does the provision of the Negotiable Instruments Law of Iowa, in the absence of special or exceptional facts or circumstances evidencing an assignment, foreclose the equity asserted and claimed by the appellants (holders) herein?

To make more understandable the legal principles hereinafter discussed, it is necessary at this point to outline the record facts.

The Mechanics Savings Bank was a banking corporation organized under the laws of the state of Iowa, doing business in· the city of Des Moines.  On the 3d of February, 1925, the appellee Leach, state superintendent of banking, was appointed receiver for said bank, though he had been in possession of the affairs of said bank, in his official capacity as such superintendent, since the morning of December 30, 1924, when the bank suspended.

On the 30th day of December, 1924, both the Iowa National Bank and the Mechanics Savings Bank cleared through the Des Moines clearing house, and there was found due the Iowa National Bank upon said clearance the sum of $7,851.51, for which, on the same day, the Mechanics Savings Bank issued a draft drawn on the Union Trust Company of Chicago, in words and figures as follows:

"Mechanics Savings Bank 33-21
"No. 37484
"Des Moines, Ia., Dec. 30, 1924.
"Pay to the
"Order of Iowa National Bank $7851.51.
"Seventy Eight Hundred Fifty-one Dollars Fifty-one Cents
"To Union Trust Company,
"2-9   Chicago, Ill.                    Chas. Marcellus,
                                             "Cashier."

On the same day, the Iowa National Bank sent said draft for collection to the Continental & Commercial National Bank of Chicago, which bank immediately presented it to the Union Trust Company of Chicago.  Payment was refused on the ground that said Mechanics Savings Bank had closed its doors and ceased to do active business.  At the time the said draft

was so presented, the Mechanics Savings Bank had upon deposit in said Union Trust Company, after allowing all credits and sums due said trust company from the Mechanics Savings Bank, and all proper set-offs, funds more than sufficient to pay said draft. In said clearance, the said draft was issued in lieu of checks drawn by customers of the Mechanics Savings Bank, and each of said customers thereof had on deposit in said Mechanics Savings Bank funds more than sufficient to pay their various checks. The Mechanics Savings Bank charged these checks to the respective depositors' accounts. The Iowa National Bank asks that its claim be allowed as preferred against the receiver, and that it be given priority over the claims of all creditors to said fund in the hands of the Union Trust Company, and, alternatively, that it be subrogated to the rights of the drawers of said checks on the Mechanics Savings Bank so cleared, and that it have preference as a depositor.

The McCutchen & Standring Company's claim grew out of the following facts: Being a depositor of the Mechanics Savings Bank, it drew, on the 18th of December, 1924, its check for $23.50, for the purpose of purchasing New York exchange; whereupon the bank issued a draft for that amount on the Mechanics & Metals National Bank of New York. On the 29th of December, 1924, the McCutchen & Standring Company drew another check for $640.48, with which to purchase New York exchange, and received a draft on that date for said amount, drawn on the same New York bank. The checks thus issued by the McCutchen & Standring Company were charged to its checking account with the Mechanics Savings Bank, which was in excess of the amount of said checks. The two drafts thus purchased were forwarded to the customers of the McCutchen & Standring Company, and in due time were presented to the Mechanics & Metals National Bank of New York, where payment was refused, on the ground that the Mechanics & Metals Bank had been notified by Leach, the receiver, that the Mechanics Savings Bank had been closed. There were more than sufficient funds in the Mechanics & Metals Bank to pay said drafts and all set-offs and counterclaims of the Mechanics & Metals National Bank against the Mechanics Savings Bank.

As to the claim of the Commercial Savings Bank (which bank is now also in the hands of a receiver), it appears that,

in clearance between the Mechanics Savings Bank and the Commercial Savings Bank through the Des Moines clearing house, there was a balance due the Commercial Savings Bank of $11,046.87. The checks turned over by the Commercial Savings Bank to the Mechanics Savings Bank were the checks of customers of the Mechanics Savings Bank, all of which were good, and charged to the accounts of the respective drawers of the checks. For the payment thus found due, the Mechanics Savings Bank issued to the Commercial ·Savings Bank a draft or check on the Union Trust Company of Chicago for the aforesaid amount. On presentation of this draft to the Union Trust Company, payment was refused, although there were more than sufficient funds belonging to the Mechanics Savings Bank on deposit with the Union Trust Company to pay this draft and all other outstanding drafts, over and above all set-offs and claims of any kind held by the Union Trust Company against the Mechanics Savings Bank.

Plaintiff-appellee, on his appointment as receiver, withdrew and received from the Union Trust Company the amount of the deposit of the Mechanics Savings Bank, which was, in amount, in excess of all outstanding drafts issued by the Mechanics Savings Bank on the Union Trust Company.

The foregoing facts are admitted of record, and it is further stipulated that, at the time of drawing these drafts, the Mechanics Savings Bank credited said drafts on its books to the account of the Union Trust Company, and debited itself for the amount of said drafts; that none of said drafts nor any part thereof has been paid; that checks for which said drafts were issued were immediately charged to the respective accounts of the customers, and that there were sufficient funds on hand to the credit of the various customers to meet the various checks; that said drafts, when issued, were good, and continued good, and would have been paid, but for the reason that, immediately upon the appointment of the receiver, the superintendent of banking notified the drawee banks, and stopped payment of the drafts.

Generally, it may be said that, on the morning of December 30, 1924, the Mechanics Savings Bank suspended business, and was immediately taken over by the state superintendent of banking, who thereupon telegraphed the Union Trust Company of Chicago and the Mechanics & Metals Bank of New York of

such suspension, and directed that no checks or drafts drawn upon the accounts in the Mechanics Savings Bank be honored. Shortly thereafter, the state superintendent of banking withdrew from the Union Trust Company and the Mechanics & Metals Bank the credit balances existing therein in favor of the Mechanics Savings Bank.

I. Does our Negotiable Instruments Act furnish an answer to the first question? The provisions material to our inquiry read as follows:

"A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder, unless and until it accepts or certifies the check." Section 9650, Code of 1924 (Section 189 of the Negotiable Instruments Act).

Further:

"A bill of itself does not operate as an assignment of the funds in the hands of the drawee available for the payment thereof, and the drawee is not liable on the bill unless and until he accepts the same." Section 9588, Code of 1924 (Section 127 of the Negotiable Instruments Act).

The terms "draft" and "check" are used interchangeably, and courts have uniformly held that drafts are checks, within the ordinary meaning of that term. The only distinguishing feature between the two is that in a draft the drawer is a bank, while in the ordinary check the drawer is an individual. Any material distinction, therefore, between these two instruments being waived, it may be said that, prior to the enactment of the Negotiable Instruments Law in this state, this court adopted and followed the minority rule, that a check or draft operated as an equitable assignment, giving title to the payee of so much of the drawer's funds on deposit as the amount for which the check was drawn. *Roberts v. Austin Corbin & Co.*, 26 Iowa 315; *Kuhnes v. Cahill*, 128 Iowa 594; *Thomas v. Exchange Bank*, 99 Iowa 202; *May v. Jones*, 87 Iowa 188. This rule was contrary to the numerical weight of judicial authority. 5 Corpus Juris 918, Section 82 (2); *McIntyre v. Farmers & Merch. Bank*, 115 Mich. 255 (73 N. W. 233); *Attorney General v. Continental Life Ins. Co.*, 71 N. Y. 325; *Fourth Street Bank v. Yardley*, 165 U. S. 634 (41 L. Ed. 855). It is thus seen that the Uniform Negotiable

2. BILLS AND NOTES: drafts and checks: distinction.

Instruments Law prescribed a rule in accordance with the weight of judicial authority at common law, that a check or draft of itself does not operate *pro tanto* as an assignment of the fund on deposit, and the drawee-bank is not liable to the payee until it has accepted or certified the same.

We have no inclination at this time to adhere further to the minority rule, in the teeth of the statute. See *Kaesemeyer v. Smith,* 22 Ida. 1 (123 Pac. 943); *Boswell v. Citizens Sav. Bank,* 123 Ky. 485 (96 S. W. 797); *Bowker v. Haight & Freese Co.,* 146 Fed. 257; *Baltimore & Ohio R. Co. v. First Nat. Bank,* 102 Va. 753 (47 S. E. 837); *Taylor's Administrator v. Taylor's Assignee,* 78 Ky. 470; *First Nat. Bank v. Hargis Com. Bank & Tr. Co.,* 170 Ky. 690 (186 S. W. 471); *Elyria Sav. & Bank. Co. v. Walker Bin Co.,* 92 Ohio St. 406 (111 N. E. 147). For a full discussion of the principle and citation of cases see Brannan's Negotiable Instruments Law (4th Ed.) 902 *et seq.* See, also, 5 Uniform Laws Annotated (Uniform Negotiable Instruments Act) 471, Section 127.

It is obvious that the intent and purpose of the Negotiable Instruments Act are to make uniform the law governing commercial paper, and it is expressly recognized by the court of last resort in several of the states that the statutory provisions under discussion have changed the minority rule in this particular. We approve the pronouncement in *Clark v. Toronto Bank,* 72 Kan. 1 (82 Pac. 582, 2 L. R. A. [N. S.] 83), which reads:

"A uniformity of decision in different jurisdictions upon matters of commercial usage is especially to be desired, and the question here presented, being of that character, affords strong argument in favor of a solution that shall be in harmony with the generally prevailing doctrine."

In *Kaesemeyer v. Smith,* supra, the thought is expressed as follows:

"This section of the statute clearly provides that the issuing of the check in no way transfers or assigns to the payee of such check the fund or any part of the fund of the depositor who draws the check, and that the bank is in no way liable to the holder of such check until the bank accepts or certifies the same."

In *Cook v. Lewis,* 172 Ill. App. 518 (1912), it is said:

"From what has been stated above, it would seem to be evident that the legislature intended, by this section of the act,

to change the rule in Illinois so as to make it conform to the rule which obtains in most of the other states and in England. We are of the opinion that such was and is its effect * * * ."

Both jurisdictions supra, Idaho and Illinois, held, prior to the adoption of the Negotiable Instruments Law, that a check operated as an assignment *pro tanto* of the funds in the hands of the drawee-bank.

The legislative intent in the enactment of Sections 127 and 189 of the original act was to remove the conflict between the majority and the minority holdings in this particular, and to make clear that thereafter the drawee should not be deemed liable to a holder, as had theretofore been held under the minority rule, at least in those situations where the holder's claim to be an assignee rested upon the instrument alone.

It is suggested by a few courts, for example, *Wasgalt v. First Nat. Bank,* 117 Minn. 9 (134 N. W. 224), that a check on a bank in which the drawer has funds on deposit subject to check is an assignment of such funds of the drawer to the amount of the check, "which assignment is complete as between the drawer and payee when the check is given, and complete as between payee or holder and the bank when the check is presented for payment." The notion of assignment, however, within the purview of the Negotiable Instruments Law, is not subject to a piecemeal consideration in this manner, and in commenting on this proposition it is said by Professor Brannan:

"It is submitted that this distinction is unsound, and, like *Gruenther v. Bank of Monroe,* supra [90 Neb. 280 (133 N. W. 402)], another example of the tendency of some courts to take a narrow view of the statute and hark back to the old law of the state." Brannan's Negotiable Instruments Law (4th Ed.) 912, Section 189.

It may be pertinent to ask what has been our attitude on the provisions of the act in question since its enactment in Iowa, in 1902, as we have had occasion to refer to the "equitable assignment theory" in several decisions. In *Bloom v. Winthrop St. Bank,* 121 Iowa 101 (1903), the check in question was dated August 4, 1899, and in *Kuhnes v. Cahill,* 128 Iowa 594, 1905), the check was presented for payment August 12, 1901. It is apparent, therefore, that both decisions were governed by the rule

of law announced by this court prior to the adoption of the Negotiable Instruments Act.

In *Hove v. Stanhope St. Bank,* 138 Iowa 39, at 42 (1908), it is said:

"For the purposes of this case, however, it may be conceded that, in so far as law actions are concerned, the statute referred to should be held to take the place of previous decisions of this court."

In the *Hove* case the facts disclose that it was the clear and express intent of the parties (as evidenced by a separate writing) that an assignment of the fund in the bank was intended, and we discover no legal or equitable reason why such an assignment cannot be made, in the face of the provision of the Negotiable Instruments Law.

In *Dolph v. Cross,* 153 Iowa 289, at 294 (1911), it is said:

"This section [3060-a189, Code Supp., 1913] does not cover the situation here presented. The intervener is not relying upon the 'check of itself.' He bases his claim, not only upon the check, but upon the further fact that a special deposit was made to meet this very check after the issuance thereof. The bank, having received the deposit for such specific purpose, was bound by the conditions imposed."

The next case in chronology, *McClain & Norvet v. Torkelson,* 187 Iowa 202 (1919), has been provocative of much comment in textbook and law journal, and also of explanation in a subsequent decision of this court, *Murray v. American Sav. Bank,* 197 Iowa 318 (1924).

In the *Torkelson* case, the facts disclose that one Torkelson drew checks upon the Forest City National Bank against a general checking account. The Freeborn County State Bank, upon presentation of these checks, paid the same. Torkelson was indebted to the plaintiffs, who garnished the Forest City National Bank. The garnishment process was served after the checks had been paid by the Freeborn Bank, and before the checks reached the drawee-bank. One declaration in the opinion in this case should be, and it is now, overruled, to wit:

"We hold that, even in a law action, the statute has not changed the rule as between the drawer, his creditors, and the bank that pays the check."

See, also, *El Dorado Nat. Bank v. Butler County St. Bank,* 120 Kan. 109 (242 Pac. 475).

This statement cannot be reconciled with the statute in question, which expressly provides that a check of itself does not constitute an assignment, and that the drawee is not liable to the holder unless and until it accepts or certifies the check. It is apparent that, before the payment or certification by the drawee, or in the absence of exceptional facts or circumstances negativing the power of revocation, the drawer of a check may countermand the order, and since the check of itself is not an assignment of the drawer's funds, the drawee-bank may recognize with impunity a "stop-payment order" given by the drawer.

In the case of *In re Estate of Knapp,* 197 Iowa 166 (1924), the plaintiff (payee of a check payable ten days after death of maker) sought to establish a claim in probate against the estate of deceased maker. It was held that the claimant was not entitled to recover, for the reason that, under the circumstances, the check did not constitute a completed gift. It was not a valid gift *causa mortis,* since the delivery of the check was not made in contemplation of death, and it was not a valid gift *inter vivos,* since "it did not constitute an assignment of the funds in the bank to the credit of the drawer." See critical note in 8 Minnesota Law Review 546 (May, 1924).

In *Murray v. American Sav. Bank,* 197 Iowa 318 (1924), the facts are rather peculiar and unusual, in that A had on deposit in the bank a certain sum, and was indebted to the bank on a matured note for $500. B was a depositor, and indebted to A. B gave his check on the bank to A, who took this check, together with other money, to the bank, to pay off his note; but on the suggestion of the cashier that he was too busy to attend to the matter at that time, A left, and, on returning to the bank the next morning, found the bank closed, as insolvent. A claimed the right to set off against his indebtedness to the bank not only the amount to his credit in his own account, but also the amount of B's check. It is pointed out in the opinion that the bank was not liable as an acceptor or certifier, since such a relation would find its basis in writing, and that the check, by virtue of the Negotiable Instruments Statute could not be treated as an assignment against the bank. The set-off was allowed, however, on the theory that A had made a tender of payment of his debt,

which tender, though not in legal money, was not objected to, and was kept good.

In making answer to the argument of the appellee that the issuance of a check against a deposit in the drawee-bank is deemed a *pro tanto* assignment to the amount of the check, it is said:

"That this was the rule in this state, as pronounced in many cases prior to the adoption of the Negotiable Instruments Act, is conceded. These cases are still relied on by the appellee. It is further contended by the appellee that since the adoption of the Negotiable Instruments Act we have adhered to our former precedents, and that the rule is now what it was before, and consequently that a check of itself *does* operate as an assignment *pro tanto* of the funds to the credit of the drawer in the drawee bank."

The opinion then reviews the decisions of this court since the adoption of the act, and points out the inapplicability of those cases under the facts.

In conclusion, therefore, and in answer to the first question presented on this appeal, we hold that the issuance of a draft or check upon a bank does not, in the absence of special facts or circumstances, operate as an assignment *pro tanto* of the fund against which the instrument is drawn.

II. We now inquire whether the record discloses exceptional facts or circumstances to entitle the holder in a court of equity to assert a claim superior to that of the receiver of the insolvent drawer, appointed after the issuance of the drafts in question, but before their presentation to the drawee.

It is well established that special facts in a case may take it out of the ordinary rule. *Akin v. Jones,* 93 Tenn. 353 (25 L. R. A. 523). It is said in *Reviere v. Chambliss,* 120 Ga. 714 (48 S. E. 122), quoting from *Jones v. Glover,* 93 Ga. 484:

"In order to infer an equitable assignment, such facts or circumstances must appear as would not only raise an equity between the assignor and assignee, but show that the parties contemplated an immediate change of ownership with respect to the particular fund in question, not a change of ownership when the fund should be collected or realized, but at the time of the transaction relied upon to constitute the assignment."

In *First Nat. Bank v. Dubuque S. W. R. Co.,* 52 Iowa 378,

it is said that a bill of exchange drawn upon a general fund and not accepted by the drawee does not operate as an assignment, but is evidence to be considered with other circumstances in determining the intention of the parties. See, also, *Covert v. Rhodes,* 48 Ohio St. 66 (27 N. E. 94).

It is clear that Section 189 of the Uniform Negotiable Instruments Act (Section 9650, Code of 1924) does not prevent an assignment by a depositor of his deposit or any part thereof, and such assignment need not be made in formal terms. An action in equity will lie, by the payee of a check to whom an assignment of the fund was also given, notwithstanding the provision of Section 189. *Hove v. Stanhope St. Bank,* supra.

The rule is stated in *Clark v. Toronto Bank,* 72 Kan. 1 (82 Pac. 582), wherein, after due reference to the minority rule, it is said:

"Nevertheless, the great weight of authority is to the effect that an unaccepted check or draft in the usual form does not, in the absence of exceptional circumstances, amount to an assignment, in law or equity, of any part of the drawer's deposit [citing cases]. This rule has frequently been enforced in controversies between the holder of a draft and the assignee or receiver of its insolvent drawer [citing cases]."

See, also, 7 Corpus Juris 751, Section 547, and page 675, Section 390; *First Nat. Bank v. Farmers St. Bank,* 120 Kan. 706 (244 Pac. 1039); *Gellert v. Bank of California,* 107 Ore. 162 (214 Pac. 377); *Spiroplos v. Scandinavian-American Bank,* 116 Wash. 491 (199 Pac. 997); 9 Harvard Law Review 428; 12 Ibid. 572; 1 Morse on Banks and Banking (5th Ed.), Section 248.

Upon a review of the decisions in various jurisdictions since the adoption of the Uniform Negotiable Instruments Act, it may be said that, even in the absence of acceptance or certification, the holder of a check or bill may have effective rights against the drawee by virtue of (1) an assignment, (2) a contract for his benefit, (3) a trust for his benefit; and there may be other conditions or special facts giving rise to an equation resulting in the solution of the problem in equity in favor of the holder.

We deem it unnecessary to pursue this particular inquiry further; and it is sufficient to state that, although the statute in

question indicates that an assignment may be shown by facts and circumstances which evidence a clear intent to assign, such intent cannot be shown by acts which are obviously done in conformity to the usages and rules of the Law Merchant. In each case the inquiry is whether an intention to transfer ownership in the fund has been carried out, so that thereafter the drawer-assignor has no further control over the fund or power of revocation. If the bill or check, plus something else, may be viewed as an assignment, as between the drawer and the payee, clearly, under such circumstances, a court of equity will distribute the fund under its control so that equity will be done.

In the case at bar, the act of the drawer-bank in charging its customers with the checks drawn on it was just what is ordinarily done. The act of the drawer-bank in crediting the amount of the draft to the drawee-bank is what is always done. Beyond these acts the record discloses nothing indicating an intent to assign, except the issuance of the drafts, which *per se* does not operate as an assignment.

With this view of the law applicable to the facts, the decree entered by the trial court is—*Affirmed.*

EVANS, STEVENS, FAVILLE, and VERMILION, JJ., concur.

ALBERT and MORLING, JJ., dissent.

ALBERT, J. (dissenting).—I. I regret to disagree with the majority of my brethren on the question involved in this case; but, owing to its importance, and to my belief that eventually the majority will, of necessity, be compelled to recede from their position here taken, I am filing this dissent.

The real question of disagreement arises from the following proposition: A draft is drawn by one bank on another, and then delivered to the payee, in whose hands it remains. The drawer bank becomes insolvent before the draft is presented for payment, and the receiver of the drawer bank withdraws the fund from the drawee bank. The question is whether, between the receiver and the holder of the draft, the transaction amounts to an equitable assignment of the fund *pro tanto.*

It is a well settled principle of law that the receiver has no greater or higher rights, but simply stands in the shoes of his principal. *Receivers v. Patterson Gas Light Co.,* 23 N. J. Law

283; *Black v. Manhattan Trust Co.,* 213 Fed. 692; *Quincy M. &
P. R. Co. v. Humphreys,* 145 U. S. 82; *Officer v. Officer & Pusey,*
127 Iowa 347; 34 Cyc. 191-193. The same rule applies to an
assignee for the benefit of creditors *(Whitcomb v. Carpenter,*
134 Iowa 227; *Page County v. Rose,* 130 Iowa 296; *Nurse v.
Satterlee,* 81 Iowa 491); and to a trustee in bankruptcy in Fed-
eral court *(Security Warehousing Co. v. Hand,* 206 U. S. 415;
*Thompson v. Fairbanks,* 196 U. S. 516; *York Mfg. Co. v. Cassell,*
201 U. S. 344).

With this question out of the way, a simple statement of the
proposition is whether the drawing and delivery of a draft to
the payee amounts to an equitable assignment while the draft
remains in the hands of the payee, the drawer becoming in-
solvent; and the funds from the drawee bank at the time of
trial are in court in the hands of the receiver of the drawer.
At least until the adoption of the Negotiable Instrument Law,
this court was committed to the rule that the making and delivery
of a draft was a *pro tanto* assignment of the funds in the hands
of the drawee bank. The first discussion of the question was
in the case of *Roberts v. Austin Corbin & Co.,* 26 Iowa 315;
*Schollmier v. Schoendelen,* 78 Iowa 426; *May v. Jones,* 87 Iowa
188; *Poole, Gilliam & Co. v. Carhart,* 71 Iowa 37; *Thomas v. Ex-
change Bank,* 99 Iowa 202; *Percival v. Strathman & Beh,* 112
Iowa 747; *Bloom v. Winthrop St. Bank,* 121 Iowa 101; *Kuhnes
v. Cahill,* 128 Iowa 594; *State v. Gibson,* 132 Iowa 53; *Hove v.
Stanhope St. Bank,* 138 Iowa 39. The majority opinion recog-
nizes this fact, and says that the court is no longer disposed to
adhere to this rule, because of the adoption by this state of the
Uniform Negotiable Instrument Act. Section 9650, Code of 1924,
reads as follows:

"A check of itself does not operate as an assignment of any
part of the funds to the credit of the drawer with the bank, and
the bank is not liable to the holder, unless and until it accepts
or certifies the check."

The majority opinion quotes from *Hove v. Stanhope St.
Bank,* supra, as follows:

"For the purposes of this case, however, it may be conceded
that, in so far as law actions are concerned, the statute referred
to should be held to take the place of previous decisions of this
court."

That case further says, however, quoting from *Dillman v. Carlin*, 105 Wis. 14 (80 N. W. 932):

" * * * if by any means the parties interested are brought into a court of equity while the bank is yet the debtor, and can be protected against paying the debt twice, and it stands indifferent as to who gets the money, so long as it is protected, the check holder will be preferred to the drawer or any subsequent claimant, whether by assignment of the drawer, or by legal process served upon the drawee."

The opinion proceeds:

"And we see no reason why the rule should not be applied by courts of equity to cases like the present. Giving to the section of the Code under consideration its full force and effect in law actions, we are of the opinion that, where the parties are properly in court in an equitable action, and where it is shown that the power intended to assign the entire fund is a part thereof, the rule of the cases heretofore referred to should govern, and a party holding such assignment of a fund on general deposit should be protected, as against subsequent claimants at least."

The case of *Kaesemeyer v. Smith*, 22 Ida. 1 (123 Pac. 943), cited in the majority opinion, is not a case where the contention is between the drawer and the payee of the draft. In that case the check was drawn and delivered, but a garnishment was served on the bank before the check was presented.

In *Cook v. Lewis*, 172 Ill. App. 518 (1912), Lewis received a check from the plaintiff's decedent, and cashed the same at the bank after the death of the maker of the check. Suit was brought by the administrator, to recover the amount collected. The case turned wholly on the proposition that the death of the drawer of the check revoked the right of the bank to pay; and while the Negotiable Instrument Statute, which is similar to ours, is discussed, the case is made to turn wholly on the right of the bank to pay after the death of the maker.

In *First Nat. Bank v. Hargis Com. Bank & Tr. Co.*, 170 Ky. 690 (186 S. W. 471), and *Elyria Sav. & Bank. Co. v. Walker Bin Co.*, 92 Ohio St. 406 (111 N. E. 147) (analogous to this case is our case of *In re Estate of Knapp*, 197 Iowa 166), the action was brought by the holder of the check against the bank, which had refused to pay. Neither one is a case affecting the nar-

row question we have as to the rights between the drawer and the payee of the check or draft.

In the case of *Murray v. American Sav. Bank,* 197 Iowa 318, what is said with reference to the Negotiable Instrument Law is dictum, as the case was determined on a wholly different basis. Further than that, the drawee bank was defeated in the court below, in spite of the protection provided by the section of the Negotiable Instrument Act under consideration.

As to the case of *Roberts v. Austin Corbin & Co.,* supra, the majority opinion, of course, squarely overrules what is said in that case. It is to be noted that this case determines the matter on a purely equitable basis, all parties and the money being in court, regardless of whether or not it amounts to a *pro tanto* assignment. This is a correct expression of my contention in this case.

One other Iowa case deserves attention: In the case of *McClain & Norvet v. Torkelson,* 187 Iowa 202, in speaking of the Negotiable Instrument Act, the force and effect of this section of the statute was under discussion, and, after a very elaborate review of the authorities, we there held that, in spite of this section, as against a garnishee there was an assignment of the fund, and the rights of the holders of the checks were superior to those acquired under the garnishment. The *Torkelson* case is overruled in the majority opinion. I do not now stop to discuss this question, because, while there is much that is said in the *Torkelson* case that is favorable to my view, at the same time third parties are involved therein, and hence, whatever the rule may be in cases where third parties are involved, I want to limit my discussion to the case at hand. So far, I have given attention to the matters referred to in the majority opinion.

II. I am not able to convince myself that the question involved herein is in any manner affected by or controlled by the Negotiable Instrument Law. It seems to me that the making and delivery of a draft to the payee, while the same remains in his hands and unnegotiated, make a simple contract between the parties, which should be controlled by the general law of contracts, and not by the Negotiable Instrument Law. The parent of the Negotiable Instrument Law, the Law Merchant, as I understand it, came into being for the purpose of making liquid what we now call, in general terms, ''commercial paper,'' and every pur-

pose and intention of the law had to do with such paper when it was once negotiated and passed into circulation. I do not understand that it ever did or was intended to in any way affect or control such paper while it was still in the hands of the original payee. If I am correct in this notion, then these drafts in the hands of the payee were simple contracts, in no way affected by the Negotiable Instrument Law. It has been held that in a suit by the payee it was not important whether the instrument was negotiable or nonnegotiable. *Cherry v. Sprague,* 187 Mass. 113 (72 N. E. 456).

It was held in *Reed v. Murphy,* 1 Ga. 236, that, even though the instrument is without negotiability, it is enforcible as a common-law contract. We have said in the case of *Fullerton Lbr. Co. v. Snouffer,* 139 Iowa 176, that negotiability is not necessary to validity. What difference does it make, between the two original parties, whether the instrument is negotiable or nonnegotiable, so far as their respective rights are concerned as against each other? I am sure that my brethren and I would have no difficulty on this proposition in event that the instrument were nonnegotiable. No one would contend, under such circumstances, that it was controlled by the Negotiable Instrument Law; and, as this instrument never was negotiated, my opinion is that, never having passed into the field of commerce, it is not affected or controlled by the Negotiable Instrument Law.

But, assuming that I am in error in this respect, I am then confronted with the provisions of the above quoted section of the statute.

We said in the *Hove* case, supra, in discussing the force and effect of this section of the statute:

"This section was undoubtedly enacted for the purpose of protecting banks against losses which might be occasioned by the double payment of checks on general deposit; and its only intent and purpose is undoubtedly to protect banks only when they are acting in good faith, and without any attempt to assist particular persons in the collection of their debts, to the exclusion of others, who are equally as much entitled to protection."

The court, in its majority opinion, of course overrules this doctrine. I think it is logical, and is a correct statement of the purpose of this section of the statute.

In *Elgin v. Gross-Kelly & Co.,* 20 N. M. 450 (150 Pac. 922, at 925), discussing this question, the court said:

"This contention arises by virtue of some confusion as to Section 189 of the Negotiable Instruments Act [which is identical with the Iowa Act], which, while providing that a check of itself does not operate as an assignment of any part of the funds to the credit of the drawer, is clearly designed for the protection of the bank, rather than a provision affecting the relation between the maker of the check and the payee. This is borne out by the fact that the latter portion of the section provides that the bank is not liable to the holder unless and until it accepts or certifies the check."

We find this conclusion supported by Mr. Daniel in his work on Negotiable Instruments, 1852, Section 1643, Vol. 2 (6th Ed.), where he says:

"The provision of the statute [referring to the Negotiable Instrument Statute] that a check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, is a declaration of the rule that, as against a drawee bank, a check is not an assignment of the fund. But, as against the drawer, the giving of a check for value on an ordinary bank deposit should be considered an assignment of the fund *pro tanto.*"

As supporting that decision, the New Mexico court cites our case of *Hove v. Stanhope St. Bank,* supra.

We have reannounced this doctrine, that the section in question was for the protection of the bank only, in the cases of *Cable v. Iowa St. Sav. Bank,* 197 Iowa 393, at 403; and *Thomas v. Exchange Bank,* 99 Iowa 202. See, also, *Dunlap v. Commercial Nat. Bank,* 50 Cal. App. 476 (195 Pac. 688).

Assuming, therefore, that the Negotiable Instrument Law is not controlling in the situation before us, we are of the notion that the general doctrine of equitable assignment is applicable to this situation. With both parties and the funds before the court, as said in the *Corbin* case, in equity should the drawer or the drawee be entitled to the fund?

As sustaining the proposition that, as between the parties, the drawing and delivery of a draft to the payee constitute an equitable assignment, see *Federal Reserve Bank of St. Louis v. Millspaugh* (Mo.), 282 S. W. 706; *Federal Reserve Bank v.*

*Peters,* 139 Va. 45 (123 S. E. 379) ; *Raesser v. National Exch.
Bank,* 112 Wis. 591 (88 N. W. 618) ; *Hawes v. Blackwell,* 107
N. C. 196 (22 Am. St. 870) ; *Hulings v. Hulings Lbr. Co.,* 38 W.
Va. 351 (18 S. E. 620) ; *Columbia Nat. Bank v. German Nat.
Bank,* 56 Neb. 803 (77 N. W. 346) ; *Schuler v. Laclede Bank,* 27
Fed. 424 ; *In re Brown,* 2 Story (U. S. C. C.) 502 ; *Morrison v.
Bailey,* 5 Ohio St. 13 ; *Bell v. Alexander,* 21 Gratt. (Va.) 1 ;
*Munn v. Burch,* 25 Ill. 35 ; *Fogarties & Stillman v. State Bank,*
12 Rich. (S. C. Law) 518 ; *Whitehouse v. Whitehouse,* 90 Me.
468 (60 Am. St. 278) ; *Industrial Tr. T. & Sav. Co. v. Weakley,*
103 Ala. 458 (49 Am. St. 45) ; *Northern Trust Co. v. Rogers,*
60 Minn. 208 (51 Am. St. 526) ; *Dillman v. Carlin,* 105 Wis. 14
(80 N. W. 932) ; *Farrington v. Fleming Com. Co.,* 94 Neb. 108
(142 N. W. 297) ; *Elgin v. Gross-Kelly & Co.,* 20 N. M. 450 (150
Pac. 922).

To elaborate a little further, to my mind, in a situation of
this kind, in equity between drawer and the payee, with the
funds in court, a *pro tanto* share of the fund is appropriated by
the very drawing and delivery of the instrument.   The very
words "equitable assignment" are used because the assignment
is recognized only in courts of equity, not in courts of law.  If
it were recognized in a court of law, it could be enforced there,
and we would never have heard of any such words as "equitable
assignment."   Therefore, it is an assignment of that much of
the debt which a court of equity will recognize and a court of
law will not.   The philosophy of the matter is that this fund has
been appropriated by these drafts, and it did not pass to the
receiver by reason of his appointment and the authority con-
ferred upon by him by law thereunder, but, when he received it,
he held it subject to the equities outstanding against it.  It is an
equitable ground, warranting the court in ordering so much of
the fund paid to the holder of the instrument as is called for
on its face.   Another thought is the very fact that the drawer
is insolvent, and the payee must lose.  It is an equitable circum-
stance.   In other words, the drawing bank received this money
in the first instance, and now, under the holding of the majority
opinion, it is entitled to hold an equivalent amount, without de-
livering to the purchaser of the draft any consideration what-
ever.

In 5 Corpus Juris 848, it is said :

"At an early day, courts of equity disregarded the common-law rule against the assignment of choses in action. There thus arose what is termed an 'equitable assignment,' which operated to give the assignee a title that, although not cognizable at law, equity will recognize and protect; and such assignments are enforced in equity, when they are made *bona fide* for a valuable consideration."

It is in the nature of a declaration of trust, and its foundation is in the principles of natural justice and essential fairness, without regard to form. To work such an assignment, there must be an actual or constructive appropriation of the fund or debt, coupled with an intention on the part of the assignor to transfer the personal interest in the fund or debt; and if these elements exist, an equitable assignment is thereby created.

In 3 Pomeroy's Equity Jurisprudence, Section 1280, the author lays down the rule that a sure criterion is whether the transaction between the parties, if assented to by the debtor of such alleged assignor, creates an absolute present indebtedness payable by him to such alleged assignee, or whether it creates merely an obligation by such assignor to make payment out of that particular debt. If the former, an equitable property in the debt, and not a mere right of action as against such primary debtor, passes to such assignee, and an equitable assignment is effected.

Time forbids that I should pursue this subject further; but, in view of the fact that the majority opinion overrules the well established principle in this state for which I am contending, and which has been decided in some twenty different cases both before and after the passage of the Negotiable Instrument Law, I feel warranted in noting this dissent. I can see no harm, and much good, to come from a recognition of this doctrine of equitable assignment in this character of cases, as it appeals to one's sense of actual justice and fairness, in that the payee of the check has parted with his money, and received no return whatever therefor. It is my idea that he does not become entitled to recognition as a depositor, under the present statute, but, if he has any right at all in the insolvent estate, he will stand only in the shoes of a general creditor, under our statutes as they now stand; and it is a well-known fact that none of the insolvent banks paid the depositors in full, to say nothing of any dividend

to general creditors. By such a rule we would not be impinging on the Negotiable Instrument Law, and we would not be creating differences in the interpretation of the same among the different states.

Up to this time, we have consistently held that a check against the fund in a bank would take priority over a garnishment of the bank. *Kuhnes v. Cahill,* 128 Iowa 594; *Dolph v. Cross,* 153 Iowa 289; *McClain & Norvet v. Torkelson,* 187 Iowa 202. We have also held, up to this time, that the holder of a check might bring an action against the drawee bank. *Roberts v. Austin Corbin & Co.,* 26 Iowa 315; *Schollmier v. Schoendelen,* 78 Iowa 426; *May v. Jones,* 87 Iowa 188; *Thomas v. Exchange Bank,* 99 Iowa 202; *Percival v. Strathman & Beh,* 112 Iowa 747; *Bloom v. Winthrop St. Bank,* 121 Iowa 101. Also, that, if a check is not presented within a reasonable time, and thereby a loss occurs by reason of the drawee bank's becoming insolvent, such loss must fall on the check holder. *Northern Lbr. Co. v. Clausen,* 201 Iowa 701; *Knauss v. Aleck,* 202 Iowa 91. If the majority opinion is right, then both of these opinions are erroneous.

The rule as above pronounced by the majority means a total change of front and an overruling of each and all of the above cited cases. I think the holding in this case should have been exactly the reverse of the majority opinion.

MORLING, J., joins in this dissent.