ARTEMUS P. CLIFFORD *v.* WEST HARTFORD CREAMERY CO., INC.

May Term, 1930.

Present: POWERS, C. J., SLACK, and THOMPSON, JJ., and GRAHAM, Supr. J.

Opinion filed January 7, 1931.

230

232

*George L. Hunt* for claimant Richford Savings Bank.

*Stanley C. Wilson* for claimant George W. Lamphere.

*Chas. B. Adams* for claimant the Borden Milk Company.

*Gelsi Monti* for the claimant the Northfield Co-operative Creamery.

*Raymond Trainor, Paul Gilioli,* and *Alban J. Parker* for plaintiff A. P. Gifford and claimant A. M. Peisch.

THOMPSON, J. On July 22, 1926, in a suit brought by Artemus Clifford, a receiver was appointed for the West Hartford Creamery Company, Inc., a Vermont corporation, hereinafter referred to as the Creamery Company. The Creamery Company was engaged in the general creamery business at West Hartford handling milk, cream, and butter. The receiver took possession of its property, and continued the operation of the business until May 1, 1928, when it was closed; the property having been so badly damaged by the flood of 1927 that it could not be run at a profit.

On August 15, 1925, the Creamery Company executed a mortgage on all of its real estate, machinery, and fixtures to the Richford Savings Bank and Trust Company, hereinafter referred to as the Bank, to secure the payment of a demand note for $15,700 given by it to the Bank, and also to secure "any and all other indebtedness at any time due and owing" from it to the Bank. This mortgage was a first mortgage on the property, and at the time the receiver was appointed, there was unpaid principal upon the note of $14,900. The receiver paid the note, the last payment being made on February 25, 1928.

On September 25, 1925, the Bank loaned the Creamery Company $5,000 on a joint and several note executed to it by the Creamery Company, Arthur L. Dow, and Archie M. Peisch, and indorsed by Arthur L. Dow, Archie M. Peisch, and A. P. Clifford.

On August 27, 1927, the receiver applied to the chancellor for an order of subrogation in favor of Peisch and Clifford to the rights of the Bank under said mortgage as to payments made and to be made by them on said note. On September 9, 1927, the chancellor, after hearing, ordered that said Peisch and Clifford "on their payment of the note" are and shall be

fully subrogated to the rights of said Bank as mortgagee, subject only to the prior rights of said Bank. The Bank was notified of said hearing, but was not represented at the same.

Peisch had paid $2,500 on the note prior to the order of subrogation. No other payments had been made on the note at that time. On February 27, 1928, the receiver paid $810.10 on the note and a like sum to Peisch to apply on the $2,500 he had paid on the note. The money which the receiver paid was part of the avails of the sale of real estate covered by the Bank's mortgage. On March 6, 1928, Clifford paid $1,689.90, the balance due on said note.

The receiver was directed in the order appointing him to continue the business of the Creamery Company until the further order of the court, and was directed "to issue certificates payable out of the net earnings of said Company, and with the proceeds thereof to pay the necessary expenses of the operation of said Company and to pay all taxes, insurance, and all other expenses properly incurred in operating the business of said Company."

On August 19, 1926, at a hearing held upon due notice to all creditors and parties interested, the chancellor, among other things, made the following order: "The receiver is granted leave to issue his certificates to an amount not to exceed $12,000, which certificates shall be a first lien on all present and future assets in the hands of the receiver, subject only to the first mortgage on the real estate and the payments due patrons, and to wages of employees."

Before the final decree was made there was a hearing as to priorities claimed by certain creditors, and a finding of facts was made. The chancellor found that prior to the order of August 19, 1926, for the issuing of receiver's certificates, all farmer patrons of the Creamery Company had been paid, and that the patrons mentioned in the order had reference solely to the accounts of patrons contracted by the receiver in his operation of the business.

The receiver issued certificates, signed by him as receiver, to the Bank for money loaned to him and used by him in carrying on the business. At the time of the final decree on January 3, 1930, there were three certificates that had not been paid. There is another certificate for $5,000 issued to the Bank on January 18, 1928. This has been paid except for a small

balance of interest, the payment of which is provided for in the final decree, so it is not necessary to further consider the same.

One unpaid certificate dated October 4, 1926, is as follows:

"This is to certify that I, March M. Wilson, as Receiver of the West Hartford Creamery Co., Inc., am indebted to the Richford Savings Bank & Trust Co. * * * in the sum of five thousand dollars, which sum I as Receiver promise to pay with interest from date. I further certify that the said Court of Chancery has authorized me to issue this certificate, and that by virtue of the order of said Chancellor this order is a lien on the assets of said corporation in my hands as receiver, inferior only to the first mortgage, and taxes, patrons' accounts and wages."

The second certificate dated September 6, 1927, is as follows:

"For value received, I March M. Wilson, as Receiver of the West Hartford Creamery Co., promise to pay the Richford Savings Bank and Trust Co., * * * the sum of five thousand dollars, on demand, after date with interest.

"This obligation is given with and by the order of the Chancellor, appointing the undersigned Receiver in the case of Clifford vs. West Hartford Creamery Co., Inc., in the order dated August 10, 1927, and, pursuant to such order, this certificate shall be a first lien on all the present and future assets in the hands of the Receiver, subject only to the first mortgages on real estate and machinery and fixtures, and to the payments due patrons, and to wages of employees."

The third certificate, dated October 19, 1927, is as follows:

"This certifies that I, March M. Wilson, Receiver of the West Hartford Creamery Co., appointed by the Court of Chancery for Windsor County, and acting under its authority, herein am indebted to the Richford Savings Bank & Trust Co., in the sum of two thousand dollars, payable on demand, with interest.

"This sum to be a lien prior to all other claims against the real and personal property in my hands as Receiver, except wages, taxes and payments due patrons."

The chancellor found that said three certificates were issued under the order of August 19, 1926.

At the time the receiver was appointed, the Creamery Company was indebted to the Northfield Co-operative Creamery Co., Inc., Borden Company, and one G. W. Lamphere for dairy products severally furnished by them. On May 2, 1927, the chancellor, after hearing their petitions for the same, made an

interlocutory order giving their accounts priority over the lien given to the receiver's certificates by the order of the court authorizing the issuance of such certificates. The facts of their claim will be set forth and considered later.

In the findings made before the final decree, the chancellor found that A. M. Peisch and A. P. Clifford should have a first lien upon the Creamery Company's real estate to the amount of their payments upon the $5,000 note signed by them, and that, subject to their lien, the Bank should have a prior lien upon all the remaining assets of the Creamery Company in the hands of the receiver to, in part, cover said three unpaid receiver's certificates. He further found that nothing could be realized from the assets more than sufficient to meet the debts and claims of Peisch and Clifford and the Bank, and, therefore, nothing remained for the Northfield Co-operative Creamery, Borden Company, and G. W. Lamphere.

It is adjudged in the final decree: (1) That said Peisch and Clifford, by way of subrogation under the mortgage given by the Creamery Company to the Bank, have a first lien upon all the remaining real estate of the Creamery Company in Hartford to secure the payments made by them upon the note for $5,000; (2) that the receiver pay to the bank the remaining cash on hand and deliver and convey to it by proper deeds the remaining assets of the Creamery Company in his hands, both real and personal, subject to the lien of Peisch and Clifford, but free and clear of all other encumbrances, in satisfaction, so far as may be, of the unpaid receiver's certificates.

From this decree the Bank, the Northfield Co-operative Creamery, Borden Company, and G. W. Lamphere have appealed.

The Bank, Borden Company, and G. W. Lamphere took and were allowed divers exceptions to the chancellor's findings on the final hearing and failure to find as requested. None of the appellants, however, have filed a bill of exceptions as required by G. L. 1511, 1609, 2258, so those exceptions are not before us. *Fire District* v. *Graniteville Spring Water Co.*, 102 Vt. 511, 150 Atl. 459, and cases cited.

The appeals bring the whole case, including all questions litigated in the court below which affect the final decree, regardless of the party raising them, to this Court for review. *Sheldon* v. *Clemmons*, 72 Vt. 185, 47 Atl. 796; *Essex Storage*

*Elec. Co.* v. *Victory Lumber Co.,* 93 Vt. 437, 444, 108 Atl. 426; *Westinghouse Co.* v. *Traction & Power Co.,* 97 Vt. 306, 313, 123 Atl. 201; *Buffton* v. *Crane,* 101 Vt. 276, 279, 143 Atl. 382. But the appeals bring up for review questions of law only, and, in considering such questions, we must take the undisputed facts as they appear in the record and the facts as found by the chancellor. *Middlebury Electric Co.* v. *Murkland,* 89 Vt. 10, 93 Atl. 291; *Essex Storage Elec. Co.* v. *Victory Lumber Co., supra; Westinghouse Co.* v. *Traction & Power Co., supra.*

CLAIM OF PEISCH AND CLIFFORD.

The appeal of the Bank is directed principally to that part of the decree subrogating Peisch and Clifford to the rights of the Bank under its mortgage for the money paid by them in discharging the $5,000 note, and thereby giving them priority over the unpaid receiver's certificates held by the Bank.

Subrogation is an equity called into existence for the purpose of enabling a party secondarily liable, but who has paid the debt, to reap the benefit of any securities or remedies which the creditor may hold against the principal debtor and by the use of which the party paying may thus be made whole. Bispham's Equity (10th ed.), p. 541; *Forest Oil Co.'s Appeal,* 118 Pa. 145, 12 Atl. 442, 4 A. S. R. 584. The right to subrogation is a favorite of the law, and the tendency is to extend rather than restrict its application. It is not confined to the ordinary relation of principal and surety, but arises whenever, in the complex relations of business affairs, one man is compelled to pay a debt for which another is primarily liable and which, in equity and good conscience, should have been discharged by the latter. *Hall* v. *Windsor Sav. Bank,* 97 Vt. 125, 133, 121 Atl. 582; *National Bank* v. *Cushing,* 53 Vt. 321, 325.

It appears from the findings that the Creamery Company was the principal debtor on the $5,000 note and that it was secured by the Bank's mortgage; that Peisch and Clifford signed it for the accommodation of the Creamery Company and they have been obliged to pay the balance due on it. It cannot be questioned that, on such facts, Peisch and Clifford would ordinarily have the right to be subrogated to the rights and security of the Bank under its mortgage for what they paid on the note.

The Bank, however, invokes the maxim "Equity regards that as done which ought to be done," and says that since it

really financed the business of the Creamery Company carried on by the receiver so as to avoid the depreciation in value of the property pending its final disposition, which a stoppage of the business would have caused, equity ought to have secured it therefor, and it will now regard the advancements made by the Bank on the receiver's certificates as secured, and as having priority over the claim of Peisch and Clifford.

We think the Bank, in making this claim, misapprehends the power of the court in receivership proceedings to authorize the receiver to borrow money and issue his certificates therefor.

██ ██ The jurisdiction of the court to appoint receivers of property has for its primary object the care and custody of the property which is the subject of the receivership proceeding, pending the determination of the questions involved in the litigation, and to enable the court, by placing the property under the control of its officer, to preserve it to answer the final decree which may be made in the action. The court receives the property impressed with all existing rights and equities of creditors, and the relative rank of claims and the standing of liens remain unaffected by the receivership. The appointment of a receiver vests in the court no absolute control over the property, and no general authority to displace vested liens. *Westinghouse Co.* v. *Traction & Power Co.*, 98 Vt. 130, 139, 126 Atl. 594, and cases cited.

██ ██ The court has the power to authorize the receiver of a corporation to issue certificates on which to borrow money to carry on the business of the corporation, and the exercise of such power rests largely in its discretion, but its authority to give such certificates priority over subsisting liens is limited. Such authority exists in the case of a railroad because it is a *quasi* public corporation or concern through which the public interests and convenience as well as private ownership are subserved, and where the maintenance of the roadway and equipment and the continuation of the business and operation of the road are essential, not only to the preservation of the mortgage securities, but also to the welfare and comfort of the general public. *Wallace* v. *Loomis*, 97 U. S. 146, 162, 24 L. ed. 895; *Union Trust Co.* v. *Illinois Midland Ry. Co.*, 117 U. S. 434, 455, 29 L. ed. 963, 6 Sup. Ct. 809.

In the case of private corporations which owe no duty to the public, the court has no authority to give receiver's certificates priority over prior existing liens unless it is necessary to preserve the existence of the property of the corporation or to save the property from destruction. *Westinghouse Co.* v. *Traction & Power Co.*, 98 Vt. 130, 140, 126 Atl. 594; *Oldroyd* v. *McCrea*, 65 Utah, 142, 235 Pac. 580, 40 A. L. R. 230; *Title Ins., etc., Co.* v. *California Development Co.*, 171 Cal. 227, 152 Pa. 564; *Dalliba* v. *Winschell*, 11 Idaho, 364, 82 Pac. 107, 114 A. S. R. 267, 272. And the cases are in entire accord that the court has no authority to order the issuance of certificates on which to borrow money to carry on the business of a private corporation and to give them priority over prior existing liens without the consent of the holders. See Annotations, Ann. Cas. 1913C, 39; 128 A. S. R. 102; 40 A. L. R. 244, where the cases are collected. In *Hooper* v. *Central Trust Co.*, 81 Md. 591, 593, 32 Atl. 505, 29 L. R. A. 262, quoted with approval in *Central Trust Co.* v. *Mehring Co.*, 154 Md. 477, 488, 148 Atl. 111, 116, the court said: ''It would be exceedingly dangerous to concede to a court of equity the power to displace, in favor of receiver's certificates, subsisting liens on the property of private corporations, or of individuals. No mortgage lien would ever be secure if it were liable to be postponed to subsequent obligations created by a receiver. If the power exists at all, apart from the case of a railroad mortgage, there is no reason for denying its applicability to every species of mortgage, and a mortgagee might suddenly discover that what he believed to be an ample security has been utterly destroyed and swept away by intervening liens created subsequently, by an order of the court. We are unable to give our assent to such a doctrine.'' Certainly, it cannot be said that in the instant case it was inequitable for the chancellor to fail or refuse to do that which he had no authority to do.

The Bank further says that when the receiver was appointed he became the mortgagor and assumed the Bank's mortgage as the officer of and under the orders and direction of the court; that, in equity, the receiver stands as mortgagor under the Bank's mortgage as much as any assignee of the Creamery Company would stand, and that when he borrowed money from the Bank his certificates issued therefor immediately became ''other indebtedness'' due and owing from the Creamery Company to the Bank within the condition of the mortgage,

and are secured by it; that indebtedness incurred by the receiver to the Bank must stand as highly protected as additional notes issued by the Creamery Company would have stood had there been no receiver appointed.

The Bank mistakes the status of a receiver. The ordinary receiver is not an assignee nor the agent of the corporation of which he is appointed receiver, but a ministerial officer appointed by the court to take possession of the property in litigation and hold it intact until the relative rights of all parties interested can be determined. *Underhill* v. *Rutland R. R. Co.*, 90 Vt. 472, 98 Atl. 1017; *Bell* v. *American Protective League*, 163 Mass. 558, 40 N. E. 857, 28 L. R. A. 452, 47 A. S. R. 481; *King* v. *Goodwin*, 130 Ill. 102, 22 N. E. 533, 17·A. S. R. 277; *Pelletier* v. *Greenville Lumber Co.*, 123 N. C. 596, 31 S. E. 855, 68 A. S. R. 837; *Rochester Tumbler Works* v. *M. Woodbury Co.*, 215 Mass. 194, 198, 102 N. E. 438; *Stannard* v. *Reid & Co.*, 118 App. Div. 304, 103 N. Y. S. 521, affirmed 195 N. Y. 530, 88 N. E. 1132. The title to the property is not changed by the appointment of a receiver. *Murtey* v. *Allen*, 71 Vt. 377, 381, 45 Atl. 752, 76 A. S. R. 779; *Union Bank of Chicago* v. *Kansas City Bank*, 136 U. S. 223, 236, 34 L. ed. 341, 10 Sup. Ct. 1013; *Bell* v. *American Protective League, supra*. He is not personally liable for acts done under and in conformity to the orders of the court, but only in his official capacity; and actions brought against him as receiver are actions against the receivership or the property in his hands. *In re Dawley*, 99 Vt. 306, 321, 131 Atl. 847. When the court appoints a receiver to hold the property of a corporation, the court itself assumes the administration of the estate. The possession of the receiver is the possession of the court, and the court holds and administers the estate through the receiver. *In re Dawley, supra*, p. 319, of 99 Vt., 131 Atl. 847. "A receiver," as is said in *Baird* v. *Lefor*, 52 N. D. 155, 201 N. W. 997, 999, 38 A. L. R. 807, "is an officer of the court in the sense that he is the agent or representative of the court in holding any property that the court may acquire jurisdiction over, and in disposing of the same; the hand and arm of the court, through whom the court acts. He is appointed by, and is removable at the pleasure of, the court. He is responsible to no one but the court. * * * He can sue and be sued, but only under the direction and with the permission of the court. His author-

ity comes from the court, and in its exercise he has no discretion independent of the court.''

A receiver can make no contract effectual against the estate of which he is receiver which is not first authorized, or subsequently ratified, by the court; and those who deal with him are charged with knowledge of the extent of his authority. *Lazear* v. *Foundry Co.*, 65 W. Va. 105, 117, 63 S. E. 772; *Knickerbocker Trust Co.* v. *Green Bay Phosphate Co.*, 62 Fla. 519, 525, 56 So. 699.

A receiver's certificates creating a preference cannot be issued except upon an order of the court, and the court's order authorizing their issuance must determine the extent to which the certificate holders are entitled to a priority lien. The records on file in a case, of which the orders of the court are a part, are open to inspection, and a person loaning money to a receiver on his certificates is put upon inquiry as to all that has been done in the litigation in which the certificates are authorized, and is charged with notice of all subsequent proceedings therein.

If he fails to ascertain the condition of the assets with respect to encumbrances, he takes the risk. *Smythe* v. *C. V. Ry. Co.*, 88 Vt. 59, 70, 90 Atl. 901; *Kennebec Box Co.* v. *Richards Corp.* (D. C.), 295 Fed. 418; *Ball* v. *Improved Property Holding Co.*, 159 C. C. A. 547, 247 Fed. 645; *Lewis* v. *Linden Steel Co.*, 183 Pa. 248, 38 Atl. 606, 610; *Union Trust Co.* v. *Illinois M. Ry. Co.*, 117 U. S. 434, 456, 29 L. ed. 963, 6 Sup. Ct. 809; *Mercantile Trust Co.* v. *Kanawha, etc., Ry. Co.*, 7 C. C. A. 3, 58 Fed. 6; *Moren* v. *Ohio, etc., Ins. Co.*, 224 Ky. 643, 6 S. W. (2d) 1091; *Northern Finance Corp.* v. *Byrnes* (C. C. A.), 5 Fed. (2d) 11; *Byrnes* v. *Missouri Nat. Bank* (C. C. A.), 7 Fed. (2d) 978; *Knickerbocker Trust Co.* v. *Oneonta, etc., R. Co.*, 201 N. Y. 379, 94 N. E. 871; *Continental, etc., Bank* v. *Muscatine, etc., R. Co.*, 202 Iowa, 579, 210 N. W. 787, 50 A. L. R. 139, 145.

In *Northern Finance Corp.* v. *Byrnes, supra,* it was held that a mortgagee of property in the possession of a receiver was bound to take notice of the receiver's powers; that, in advancing money to the receiver with which to pay state taxes, it acted as a volunteer, and the receiver's promise to repay the money was not binding on the court.

In *Byrnes* v. *Missouri Nat. Bank, supra,* it was held that, in the absence of special authorization, a receiver had no authority to borrow money, and much less to pledge or mortgage property of the estate as security for the repayment of money borrowed by him.

In *Lewis* v. *Linden Steel Co., supra,* the receiver of a manufacturing company was authorized to borrow $30,000 and the order provided that the certificates issued for the same should be a lien on the personal property and earnings of the company prior to all other claims. The petition of his successor for right to issue $70,000 additional certificates asked that the same be made a prior lien as in the case of the old certificates. He was authorized to issue the additional certificates, but the order contained no provision for a prior lien. The holders of the first certificates exchanged them for certificates of the second issue. The court, in holding that they had lost their priority over other creditors, said: ''The holders of the certificates issued by Mr. Warner (first receiver), had, undoubtedly, a preference to other creditors, as specified in his order of court; and, if they had held on to those certificates, they would now have a preference. But they voluntarily surrendered those certificates and accepted in lieu of them certificates issued by Mr. Wells (second receiver). Before they accepted these new certificates they were bound to look into the order of court to see what power Mr. Wells had. Had they done so, they would have seen that these new certificates had no preference. Not having done so, they have no just ground of complaint.''

The Bank relies upon *Lamoille County Savings Bank* v. *Belden,* 90 Vt. 355, 98 Atl. 1002, and other cases, which, in substance, hold that, where a mortgage secures the payment of indebtedness which the mortgagor may thereafter owe the mortgagee, and the mortgagor executes a subsequent mortgage of the same premises to another person, the first mortgage secures not only subsequent indebtedness incurred by the mortgagor before the execution of the second mortgage, but also indebtedness incurred after its execution, unless the subsequent mortgagee gives the first mortgagee express notice of his mortgage and notifies him not to make farther advances on the credit of the first mortgage.

The law of these cases, however, is not applicable to the instant case, for, as we have seen, the receiver is not the agent of

the Creamery Company. He did not assume the Bank's mortgage, but, as agent of the court, took possession of the property subject to the lien of that mortgage. The Bank had no claim by virtue of its mortgage against the receiver personally, but only against the property in the receiver's hands that was covered by its mortgage. And the receiver's certificates held by the Bank have no preference or priority except such as is provided in the orders of the court authorizing the issuance of receiver's certificates.

The Bank says that the order of July 22, 1926, appointing the receiver and authorizing him to issue certificates with which to obtain money to pay the expenses properly incurred in operating the business of the Creamery Company, gives the certificates first priority; but this is not so. That order provides that certificates issued under its authority should be payable out of the net earnings of said Company, but does not provide that they shall have any lien on the assets or earnings of the Company; and so the certificates held by the Bank are not entitled to any priority if they were issued under that order.

The chancellor found that the certificates held by the bank were issued under the authority of the order of August 19, 1926, which provides that certificates issued under its authority "shall be a first lien on all present and future assets in the hands of the receiver subject only to the first mortgage on the real estate and the payments due patrons, and to wages of employees."

The foregoing orders of July 22, 1926, and August 19, 1926, are the only orders made by the court during the receivership proceedings authorizing the receiver to issue certificates; and it is only by virtue of the order of August 19, 1926, that the Bank can claim any preference for the certificates held by it.

It cannot be questioned that if any one other than the Bank had purchased the certificates held by it they would have taken the same subject to the Bank's mortgage, which is "the first mortgage on the real estate" referred to in the order of August 19, 1926; and the Bank itself can claim no greater priority for these certificates than other purchasers would have had, simply because it is the owner of said first mortgage.

The Bank claims that the certificate of October 19, 1927, is entitled to priority because it is given such priority by its express terms. It is true that it is stated by the receiver on the face of this certificate that it is "to be a lien prior to all

other claims against the real and personal property in my hands as Receiver, except wages, taxes and payments due patrons''; but, as we have hereinbefore said, it is the order of the court and not the act of the receiver that determines the lien that a receiver's certificate shall have, and a purchaser is charged with knowledge of the extent of the lien provided in such order. Had the Bank examined the order of August 16, 1926, before it accepted this certificate, it would have seen that it could not have the lien stated on its face.

The Bank claims further that Peisch and Clifford are not entitled to subrogation because they did not comply with the terms of the interlocutory order of subrogation made September 9, 1927, whereby it was ordered that they, ''on their payment of the note of $5,000 * * * are and shall be fully subrogated to the rights of said Bank, as mortgagee, subject only to the prior rights of said Bank.'' It is doubtful if the court had the power to make this order, as $4,000 or more of the note for $15,700 and $2,500 of the $5,000 note, had not been paid at that time; and the rule is that one who is obliged to pay the whole or part of the debt·of another is not entitled to be subrogated to the rights or securities of the creditor until all of the secured indebtedness has been paid. *First National Bank* v. *Johnson,* 65 Vt. 382, 388, 26 Atl. 634; *Wilcox* v. *Fairhaven Bank,* 7 Allen (Mass.) 270; *Barton* v. *Matthews,* 141 Ark. 262, 216 S. W. 693, 9 A. L. R. 1594, and note. In *New Jersey Midland R. Co.* v. *Wortendyke,* 27 N. J. Eq. 658, the court said: ''The right of subrogation cannot be enforced until the whole debt is paid; and until the creditor be satisfied, there ought and can be no interference with his rights or his securities, which might, even by bare possibility, prejudice or embarrass him in any way in the collection of the residue of his claim.'' It is not necessary, however, to consider further the interlocutory order of subrogation, because at the time of the final hearing all of the indebtedness secured by the Bank's mortgage had been paid, and the final decree subrogated Peisch and Clifford to the rights of the Bank under its mortgage to secure them for the payments made by them on the $5,000 note.

The Bank says that equitable assignment of a mortgage by subrogation is applicable only in favor of·one who, having an interest in the premises otherwise, pays off the mortgage to protect that interest, and not to one who is a debtor; that, so far

as Peisch is concerned, he was not merely an indorser of the note but was a joint and several maker of it with the Creamery Company and as a primary debtor was bound to pay the note absolutely; that in such circumstances he cannot in equity be subrogated to the rights of the Bank under its mortgage.

The Bank relies upon *Lamoille County Sav. Bank* v. *Belden, supra,* in support of this claim; but the facts in that case are different from those in the instant case. The right of a surety to be subrogated to the securities of the creditor when he has been obliged to pay the debt of the principal debtor was not involved. There the defendant purchased certain premises covered by a mortgage executed by the grantor to the plaintiff. The defendant, in his deed, assumed and agreed to pay the mortgage debt which consisted of several notes executed by the mortgagor, two of which were also signed by accommodation parties. This Court held that the defendant, on paying the mortgage debt to the plaintiff, was not entitled to have the notes signed by the accommodation parties delivered to him uncancelled; that, on the facts, the defendant stood no better than his grantor as against the plaintiff's mortgage; that, by assuming the mortgage indebtedness, he became primarily liable as principal for the mortgage debt as a whole, and that payment by him of his primary liability would operate as an extinguishment of all the notes constituting the mortgage debt, and could afford no ground upon which to predicate the doctrine of subrogation.

In the instant case Peisch signed his name on the face of the note, and also on the back of it, waiving "demand and notice of non-payment and protest." The chancellor found that the note was executed by the Creamery Company and that Peisch and Clifford signed it for its accommodation. The legal effect of this finding is that, as between themselves, the Creamery Company is the principal debtor on the note, and that Peisch and Clifford are sureties for it. The Bank is the payee named in the note, and was the holder for value of the same.

Under the law merchant, before the enactment of the Negotiable Instruments Act (Acts of 1912, No. 99, G. L. Ch. 140), the relation between one who signed a joint and several promissory note for the accommodation of another and the party accommodated was that of principal and surety; and the holder of such a note, who had knowledge of the true relation of the parties, was bound at his peril to act toward such accom-

modation maker as toward a surety in order to preserve his rights against him. *President, etc., of Claremont Bank* v. *Wood,* 10 Vt. 582; *Peake* v. *Dorwin's Estate,* 25 Vt. 28; *Benedict* v. *Cox,* 52 Vt. 247; *People's Bank* v. *Pearsons,* 30 Vt. 711; *Westbrook Trust Co.* v. *Timberlake,* 121 Me. 64, 115 Atl. 555. And although a note did not show that a signer was a surety, he could show as against the payee that he was a surety if the payee knew it when the note was given. *Arbuckle* v. *Templeton,* 65 Vt. 205, 25 Atl. 1095. But, except as to holders who knew he had signed as surety, an accommodation maker was an original maker and became primarily and absolutely liable, as much so as the principal, to any party lawfully holding the paper. *Bank of Newbury* v. *Richards,* 35 Vt. 281; *Ballard* v. *Burton,* 64 Vt. 387, 396, 24 Atl. 769, 16 L. R. A. 664; *Rouse* v. *Wooten,* 140 N. C. 557, 53 S. E. 430, 111 A. S. R. 875, 6 Ann. Cas. 280.

█ The Negotiable Instruments Act changed the relation that had existed previously between an accommodation maker and a holder for value who knew him to be such. Under this Act an accommodation maker is liable to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be an accommodation party. Section 29 (G. L. 2899). The maker of a negotiable instrument by making it engages that he will pay it according to its tenor. Section 60 (G. L. 2929). And the person primarily liable on the instrument is the person who by its terms is absolutely required to pay the same; all other parties are secondarily liable. Section 192 (G. L. 2868).

It has been uniformly held that under these provisions of the Act an accommodation maker is primarily and absolutely liable on the instrument to a holder for value; that the duty imposed upon him to such holder is no less or greater or different than that imposed upon a maker who receives value; that the previous rules of law to the effect that, if the holder knew a party had signed for accommodation only he must be treated as a surety, have been abolished; that an accommodation party can now claim no benefit as such as against a holder, but he is liable according to the facts of his undertaking the same as if he were himself financially interested in the transaction. *Alexander* v. *Chevalier,* 98 Vt. 230, 234, 126 Atl. 498; *Union Trust Co.* v. *McGinty,* 212 Mass. 205, 98 N. E. 679, Ann. Cas. 1913C, 525; *Vanderford* v. *Farmers', etc., Nat. Bank,* 105 Md. 164, 66

Atl. 47, 10 L. R. A. (N. S.) 129; *Elgin Nat. Bank* v. *Bach*, 98 Ore. 332, 193 Pac. 1041; *Bradley Engineering, etc., Co.* v. *Heyburn*, 56 Wash. 628, 106 Pac. 170, 134 A. S. R. 1127; *Jamesson* v. *Citizens' Nat. Bank*, 130 Md. 75, 99 Atl. 994, Ann. Cas. 1918A, 1097; *First State Bank* v. *Lang*, 55 Mont. 146, 174 Pac. 597, 9 A. L. R. 1139. And an accommodation maker is discharged from liability upon the instrument only in the five ways specified in section 119 (G. L. 2988). *Union Trust Co.* v. *McGinty, supra.*

The contention of the Bank that Peisch cannot be subrogated to its mortgage is supported by *Spire* v. *Spire*, 104 Kan. 501, 180 Pac. 209, and *Merchants' Bank* v. *Bushnell*, 142 Tenn. 275, 218 S. W. 709. These cases hold that since under the Negotiable Instruments Act an accommodation maker is a maker who is primarily and absolutely bound to pay the note, he is, as between himself and the payee, a principal debtor; that when he pays the note, he is not in a position to invoke the doctrine of subrogation because the debt is not a debt of another; that the doctrine of subrogation arises only in favor of one who pays the debt of another and not in favor of one who pays the debt in performance of his own covenants.

We think, however, that the better reasoning and the weight of authority is the other way. Prior to the enactment of the Negotiable Instruments Act, an accommodation maker was entitled to be subrogated to all the rights and remedies of the creditor, including his securities, against the party accommodated, whose debt he was compelled to pay. *Peake* v. *Dorwin's Estate, supra; Clay* v. *Severance*, 55 Vt. 300, 305; *Smith* v. *Day*, 23 Vt. 656; *Austin* v. *Belknap*, 54 Vt. 495; *McDaniels* v. *Flower Brook Mfg. Co.*, 22 Vt. 274. This equitable rule has not been changed or abrogated by the Act.

The intent and purpose of the Negotiable Instruments Act is to codify and make uniform the law governing negotiable instruments, rather than to reform it. In order to establish uniformity it was necessary to change the law in some states, but where changes were made, the Act generally lays down the rule that conformed to the weight of authority. *Howard Nat. Bank* v. *Wilson*, 96 Vt. 438, 447, 120 Atl. 889; *Union Trust Co.* v. *McGinty, supra; National City Bank* v. *National Bank*, 300 Ill. 103, 132 N. E. 832, 22 A. L. R. 1153; *Leach* v. *Mechanics' Sav. Bank*, 202 Iowa, 899, 211 N. W. 506, 50 A. L. R. 388;

*Cellers* v. *Meachem,* 49 Or. 186, 89 Pac. 426, 10 L. R. A. (N. S.) 133, 13 Ann. Cas. 997.

▮▮ The Act applies only to negotiable instruments. *Duchaine* v. *Phoenix,* 100 Vt. 112, 135 Atl. 715; *Smith* v. *Hurlburt Co.,* 93 Conn. 391, 106 Atl. 319. Where it speaks it controls. *Mechanics', etc., Bank* v. *Katterjohn,* 137 Ky. 427, 125 S. W. 1071, Ann. Cas. 1912A, 439. Where it is silent, the case is governed by the rules of law and equity, including the law merchant. Section 196 (G. L. 3060). It does not attempt to regulate or change the relation of the makers of a note as between themselves as it was at the time of its enactment, but only the relation of an accommodation maker to a holder for value. The relation between an accommodation maker and the party accommodated remains the same as it was when the Act was adopted, *viz.,* that of principal and surety, with the right of the surety to be subrogated to the rights of the creditor on payment of the principal's debt. *Fuhrman* v. *Fuhrman,* 115 Md. 436, 80 Atl. 1082, 1085; *Bartel* v. *Zimmerman,* 293 Ill. 154, 127 N. E. 373; *Jefferson* v. *Century Sav. Bank,* 143 Iowa, 83, 120 N. W. 308; *Sexton* v. *Fensterer,* 154 App. Div. 542, 139 N. Y. S. 811, affirmed, 213 N. Y. 641, 107 N. E. 1085; *Gregg* v. *Texas Bank* (Tex. Civ. App.), 235 S. W. 689; *Rogers* v. *Hazel,* 147 Ky. 333, 144 S. W. 49, 50; *Wakonda State Bank* v. *Fairfield,* 53 S. D. 268, 220 N. W. 515; *Grygiel* v. *Marcille* (R. I.), 152 Atl. 44.

In *Fuhrman,* v. *Fuhrman, supra,* it was claimed that an accommodation maker of a joint and several note was not a surety within the meaning of a statute, which provided that where a surety on a note paid the same, he was entitled to an assignment thereof; and might, by virtue of such assignment, maintain an action in his own name against the principal debtor. The court said: ''We are unable to sustain this contention. The principle is well established that an accommodation party to a negotiable instrument is in effect a surety of the party accommodated, and has the same right of recourse that any other surety has against his principal.''

In *Jefferson* v. *Century Sav. Bank, supra,* it is held that one who signs on the face of a note is bound to pay it whether surety or principal, but if he in fact was surety for the principal maker of the note, and the payee held any security from the principal maker, than the surety, upon full payment of the

note, would be entitled to be subrogated to the benefit of such security.

In *Rogers* v. *Hazel, supra,* the court said: "We think that the rule is now well established that, as between himself and the party accommodated, the accommodation party is in effect a surety, and his right to recover against the party accommodated is that of a surety against the principal debtor."

The Bank raises the question that Peisch and Clifford are not entitled to subrogation because they did not pay the whole of the note for $5,000. It is not necessary for us to consider the question whether the right of a surety to be subrogated to the security held by the creditor depends upon his paying the entire debt of the principal or if it is sufficient if he pays a part of the debt and the balance is paid by the principal. See Annotation, 9 A. L. R. 1596.

The mortgage note for $15,700 was paid in full by the receiver on February 25, 1928. Prior to that time Peisch had paid $2,500 on the $5,000 note. The receiver had in his hands $1,602.20, part of the avails of the sale of real estate covered by the Bank's mortgage. On February 27, 1928, the receiver paid one-half of this money to the Bank to apply on the $5,000 note, and the other half to Peisch to apply on the $2,500 he had paid on the note. On March 6, 1928, Clifford paid $1,689.90 to the Bank which paid the $5,000 note in full.

Peisch and Clifford were entitled to the benefit of the Bank's mortgage. Since the other indebtedness of the Bank secured by its mortgage had been paid, they were entitled to have this money paid to them when they paid the $5,000 note in full. The fact that the receiver, in applying this money as he did, anticipated by a few days the payment of the note in full, did not in any way harm the Bank.

There is no error in that part of the decree subrogating Peisch and Clifford to the rights of the Bank under its mortgage.

### CLAIMS OF NORTHFIELD CO-OPERATIVE CREAMERY CO., INC., BORDEN COMPANY, AND GEORGE W. LAMPHERE.

These three creditors of the Creamery Company appeal from that part of the final decree that denies to them the priority given to their accounts by the interlocutory order of May 2, 1927.

Their accounts are for the balance due for dairy products severally sold by them to the Creamery Company over a short period before the receiver was appointed. The account of the Northfield Co-operative Creamery Co., whose place of business is at Northfield, is for milk and skim milk; that of Borden Company, whose place of business is at Richmond, is for butter; that of G. W. Lamphere, whose place of business is at West Rutland, is for cream. It appears from the statement of his account that he is a wholesale dealer of sweet pasteurized cream. These creditors, except as they are referred to individually, are hereafter called the claimants.

It is alleged in their petitions for priority, severally filed during the receivership proceedings, that they are "patrons" within the meaning of G. L. 5732, and they pray for the priority and preference given by G. L. 5732, to the accounts of patrons.

The chancellor found on the hearing of their petitions that they supplied their products regularly to the Creamery Company during the respective periods, shipping at regular intervals in the same manner that they shipped their products to any customer; that, except for the Northfield Co-operative Creamery Co. which seemed to have shipped on special orders only, the other claimants seem to have shipped whatever amounts they desired from surplus, without objection on the part of the Creamery Company.

The chancellor did not find that the claimants were patrons within the meaning of the statute, but in the interlocutory order made May 2, 1927, it is adjudged that they "be accorded the rights of, and be treated as, patrons" under the provisions of G. L. 5732, and that their respective accounts shall constitute a first lien on the real estate of the Creamery Company, subject only to mortgages and attachments made before the accrual of such accounts respectively.

It fairly appears from the findings of the chancellor and from the allegations in the petitions of the claimants for priority that each claimant is a "company" as that word is used in Chapter 239 of the General Laws, which comprises sections 5723 to 5738, inclusive, relating to the licensing of, and the furnishing of security for patrons' accounts by, creamery companies. G. L. 5723 provides that the word "company" as used in this chapter, "shall apply to a person, partnership, unincorporated

association or corporation whose principal business in this state is, or who is devoting a substantial portion of time to, the business of operating a creamery or condensed milk factory or of contracting for dairy products.''

G. L. 5732 provides that all accounts due from a company to its patrons ''shall constitute a first lien on the real estate of such company in this state and shall take precedence of any subsequent mortgage or attachment by any creditor of such company other than by a patron who may have a valid claim under the provisions of this chapter, and of any other lien except taxes.''

█ If the claimants were patrons of the Creamery Company in their transactions with it within the meaning of this chapter, G. L. 5732 gave them a lien on the real estate of the Creamery Company to the amount of their accounts which is superior to the lien of the receiver's certificates but subordinate to the lien of the Bank's mortgage, and it was the duty of the court below to give effect to this preference in the administration of the property. *Poland* v. *Lamoille Valley R. R. Co.*, 52 Vt. 144, 176; *Baldwin* v. *Spear*, 79 Vt. 43, 64 Atl. 235. If the claimants were not patrons of the Creamery Company, they are simply unsecured creditors, and the interlocutory order of May 2, 1927, is void, as the court below had no power to give the debt of an unsecured creditor preference over the receiver's certificates and the claims of other unsecured creditors.

The question resolves itself into this: Is a company, as the word is used in Chapter 239, that sells its products to another company on credit, a patron of such company within the meaning of said Chapter?

█ The fundamental rule in construing statutes is to ascertain and give effect to the intention of the Legislature. *In re Woolley's Estate*, 96 Vt. 60, 64, 117 Atl. 370; *Simonds* v. *Powers' Estate*, 28 Vt. 354. In determining the meaning of a particular word used in a statute, the intention of the Legislature is to be ascertained, not from the literal sense of the word used, but from a consideration of the whole and every part of the statute, the subject-matter, its manifest object, the history of its enactment, the trend of previous legislation upon the same subject-matter, and the evils to be corrected. *Town of Ryegate* v. *Wardsboro*, 30 Vt. 746; *Baker* v. *Jacobs*, 64 Vt. 197, 23 Atl. 588; *Osgood* v. *C. V. Ry. Co.*, 77 Vt. 334, 60 Atl. 137, 70

L. R. A. 930; *State* v. *Kelley,* 86 Vt. 237, 84 Atl. 861, 42 L. R. A. (N. S.) 437; *Martin* v. *Fullam,* 90 Vt. 163, 97 Atl. 442; *Fidelity & Deposit Co.* v. *Brown,* 92 Vt. 390, 104 Atl. 234; *In re Fulham's Estate,* 96 Vt. 308, 316, 119 Atl. 433; *In re James,* 99 Vt. 265, 132 Atl. 40; *In re Downer's Estate,* 101 Vt. 167, 176, 142 Atl. 78. And when the same word is used in different sections of the same act, or in statutes in *pari materia,* it will bear the same meaning throughout, unless it is apparent that another meaning was intended. *United States* v. *Freeman,* 3 How. 556, 565, 11 L. ed. 724; *Miller* v. *Dunn,* 72 Cal. 462, 14 Pac. 27, 1 A. S. R. 67; *Ryan* v. *State,* 174 Ind. 468, 92 N. E. 340, Ann. Cas. 1912D, 1341; *Rhodes* v. *Weldy,* 46 Ohio St. 237, 20 N. E. 461, 15 A. S. R. 584; *First Nat. Bank* v. *Holland,* 99 Va. 495, 39 S. E. 126, 56 L. R. A. 155, 86 A. S. R. 898; *Dysart* v. *St. Louis,* 321 Mo. 514, 11 S. W: (2d) 1045, 62 A. L. R. 762.

The regulation of the business of creamery companies in their dealings with the producers of milk and cream has been a subject of legislation in this State for many years, and the word "patron" has been used repeatedly in such legislation. The word first appears in Act No. 82 of the Laws of 1898. Section 1 of that act provides that every owner of a creamery shall monthly make and deliver to each of its patrons a statement of the number of pounds of milk or cream such patron delivers for that month, together with the test, pounds of butter fat, gain percent from the churn, and actual pounds of butter produced from said milk; and the price paid for the same shall be computed on the actual pounds of butter. Section 3 of the act provides that similar statements shall be made by the owners of cheese factories to their patrons, and that the price paid for the milk delivered shall be computed on the actual number of pounds of cheese made. Said section 1 was P. S. 4950, and is now G. L. 5935.

Act No. 81 of the Laws of 1898, entitled "An Act for the Protection of Dairymen, Relating to Testing Milk and Cream," provides that no measuring glasses shall be used in creameries and cheese, and condensed milk factories in determing, by test, the value of milk and cream received from different persons, or parties except such as have been tested and marked for accuracy of measurement, etc., under the supervision of the superintendent of the dairy school of the University of Vermont and State Agricultural College; and that no person

shall make tests for the purpose of measuring the content of butter fat in milk or cream, as a basis for apportioning the value of such milk or cream or the butter or cheese made from the same, unless such person has secured a certificate from said superintendent that he or she is competent and well qualified to perform such work. The provisions of this act are now G. L. 5925 and 5926.

Section 1 of Act No. 119 of the Laws of 1908, provides for the sterilizing or pasteurizing of skim milk or buttermilk that a public creamery returns to its patrons. Section 2 provides that a creamery receiving milk from three or more patrons shall be a public creamery within the meaning of the act. This act was repealed by Act No. 165 of the Laws of 1910.

Act No. 166 of the Laws of 1910 defines the duties of the commissioner of agriculture relating to creameries and similar concerns.

Section 1, now G. L. 5937, provides that he shall inspect creameries, etc., and if he has reason to believe that milk or cream delivered to the same is produced under unsanitary conditions, he shall inspect the dairy and premises of the producer of the same, and may make and enforce orders and recommendations for the improvement of the milk and cream.

Section 3, now G. L. 5938, provides for the making of yearly reports to the commissioner by creameries, etc., of the business done by them.

Section 5, now G. L. 5939, provides for the enforcement of the provisions of G. L. 5935 (P. S. 4950, Acts of 1898, No. 82, § 1), relating to statements to patrons, if the commissioner is of the opinion that a creamery or similar concern is not complying with the same.

Section 6 provides that a creamery or cheese factory receiving milk or cream from three or more patrons shall be a public creamery or cheese factory within the meaning of the act and subject to its provisions. Section 6 is now G. L. 5940. In the revision of 1917 its phraseology was changed, and G. L. 5940 reads, ''A creamery, cheese factory, condensary, or receiving station (any one of which is a company as that word is defined by G. L. 5723) and the owners, operators, managers, proprietors or officers thereof, receiving milk from less than three patrons shall not be subject to the provisions of the three preceding sections.''

When the foregoing Acts are read together, as they should be, it is apparent that the only objects the Legislature had in mind in enacting them were to secure an honest test by creamery companies of the milk and cream delivered or furnished to them by the producers of the same, and full price for the same to the latter based upon the quality of such milk and cream as determined by said test. In other words, as stated in the title of Act No. 81 of the Laws of 1898, this legislation was enacted "for the protection of dairymen." It is also apparent that the Legislature used the word "patron" as meaning the producers of milk and cream, and them only.

Chapter 239 of the General Laws provides for the licensing of a creamery company and the furnishing of security by it to secure the payment of its patrons' accounts, before it does business in this State. It is not necessary to consider in detail all of the legislation upon this subject. A brief history of the development of the same and reference to some of its important features is sufficient.

Act No. 138 of the Laws of 1906, which became Chapter 211 of the Public Statutes in the revision of 1906, provided for the licensing of foreign creamery companies before they did business in this State, and further provided that if the commissioners were satisfied that a company was not safe and entitled to public confidence, they should, before granting a license, require it to furnish a bond conditioned for the payment of all sums recovered against it. There were no provisions as to the legal proceedings to be brought, or by whom, if there was a breach of its bond by a company by its failure to pay the sums due its patrons.

Act No. 181 of the Laws of 1912 amended some of the sections of said Chapter 211, and also contained additional legislation on the subject-matter, which was made a part of said chapter. The amendments, so far as material, provided that before a license was issued to a company, the commissioners should require it to file a surety bond for the benefit of its patrons.

The additional legislation provided that, in the absence of an agreement in respect thereto, payments by a company should become due and payable on the fifteenth of each month for all milk and cream furnished or delivered to it by its patrons during the preceding calendar month. It also provided that if a company for ten days after they became due failed to pay its

patrons the several amounts due them for milk and cream, it should be in default as to all patrons whose milk and cream accounts were unpaid in full, and its bond should be forfeited to the extent of all sums then due to its patrons in this State. It further provided that the bond required by the chapter should be given to the commissioners as trustees of the company furnishing the same, for each and all of its patrons in this State, and that upon breach of condition by failure of the company to pay its patrons' accounts, the commissioners, upon application by a patron having an unpaid account, should institute appropriate proceedings on the bond in their names as trustees for the benefit of all patrons of such company to whom it might be indebted at the time such proceedings should be instituted.

Said Chapter 211 was amended again by Act No. 168 of the Laws of 1915, which also contained additional legislation that was made a part of the chapter. This act abolished the distinction between foreign and domestic creamery companies as to being licensed and bonded, and provided that all companies, as defined by section 1, should be licensed before doing business in this State.

The amendments, so far as material, provided that before issuing a license, the commissioners might require a company to furnish a bond, or they might accept, in lieu of such bond, such security by way of mortgage or otherwise as they deemed sufficient; that the same should be taken for the *sole* benefit of patrons in this State of such company; and, if a company paid its patrons weekly or bimonthly, such fact should be taken into consideration by the commissioners in determining the amount of bond or other security that such company should be required to furnish.

The additional legislation is now contained in G. L. 5732, the contents of which are hereinbefore given, and in G. L. 5736, which provides that a company shall not be required to file a bond or give security if all of its patrons consent in writing that the same need not be given.

Said Chapter 211, as amended by said Acts of 1912 and 1915, became Chapter 239 of the General Laws in the revision of 1917.

It is apparent that all of these acts we have considered have but one object in view—the protection of producers of milk and cream in their dealings with creamery companies. That there

was a necessity for such legislation is evident when it is borne in mind that the creamery companies and the producers do not deal with each other on equal terms; that the advantage has always been with the companies. It is the company that weighs the milk and cream of the producer; that tests it for the butter fat content upon which the price paid for it is based; and that fixes the price paid for the milk and cream received by it. Before the enactment of the provisions of Chapter 239, it was only by litigation by the individual producer that he could collect what was due him, if he collected at all, when a creamery company refused or failed to pay him for his milk and cream. The unfortunate experiences of producers with creamery companies in these respects presented an evil which the Legislature sought to correct by this legislation.

██ ██ All of these acts are in *pari materia*, and are to be considered as one statute. *Highgate* v. *State*, 59 Vt. 39, 7 Atl. 898. When they are so treated, and we consider the evil to be corrected, and the manifest object of this legislation, it is clear, beyond doubt, that the word "patron" bears the same meaning throughout, and that the Legislature used it as meaning the producers of milk and cream who furnish or deliver the same to a creamery company. That it is used in this sense alone is apparent from the provision of G. L. 5727, that the security required of a creamery company shall be taken for the *sole* benefit of its patrons in this State.

██ We hold that the claimants were not patrons of the Creamery Company within the meaning of that word as used in Chapter 239, and that they are not entitled to the lien given to patrons of a creamery company by the provisions of G. L. 5732. There is no error in the decree so far as the rights of the claimants are concerned.

*Decree affirmed, and cause remanded.*